# Exhibit A

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

JOSE AYALA,                    )
                              )
    Plaintiff,                 )
                              )       CIVIL ACTION NO.
vs.                           )         4:21-cv-00408
                              )
TRADER JOE'S COMPANY,          )
                              )
    Defendant.                 )

ORAL AND VIDEOTAPED DEPOSITION OF
JOSE AYALA
March 22, 2022

        ORAL AND VIDEOTAPED DEPOSITION OF JOSE AYALA, produced as a witness at the instance of the Defendant and duly sworn, was taken in the above styled and numbered cause on March 22, 2022, from 10:45 a.m. to 3:45 p.m., before Keith McCabe, CSR in and for the State of Texas, reported by computerized stenotype machine, at the offices of Littler Mendelson, P.C., 1301 McKinney Street, Suite 1900, Travis Room 1986, Houston, Texas 77010, pursuant to the Federal Rules of Civil Procedure and the provisions stated on the record or attached hereto.

Page 2

APPEARANCES

FOR THE PLAINTIFF:
Ms. Allecia Lindsey Pottinger
ALP LAW FIRM
6300 West Loop South
Suite 610
Bellaire, Texas  77401
Phone:  832.930.0997

FOR THE DEFENDANT:
Ms. Kelley Edwards
Ms. Analiza Rodriguez (via videoconference)
LITTLER MENDELSON, P.C.
1301 McKinney Street
Suite 1900
Houston, Texas  77010
Phone:  713.951.9400
Fax:  713.951.9212
Email:  kedwards@littler.com

ALSO PRESENT:
Mr. J.C. Locas, videographer
Ms. Kathryn Cahan, attorney

Page 3

INDEX

|  | PAGE |
|---|---|
| Appearances | 2 |
| JOSE AYALA | |
| Examination By Ms. Edwards | 5 |
| Examination By Ms. Pottinger | 161 |
| Further Examination By Ms. Edwards | 164 |
| Reporter's Certificate | 167 |

EXHIBITS

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 1 | Trader Joe's Co. Application For Employment | 56 |
| Exhibit 2 | Trader Joe's Company Employment Application | 65 |
| Exhibit 3 | Application | 68 |
| Exhibit 4 | Crew Review | 76 |
| Exhibit 5 | Acknowledgement of Receipt of Crew Member Handbook | 80 |
| Exhibit 6 | Your Employment At Trader Joe's | 82 |
| Exhibit 7 | Crew Member Performance and Conduct | 85 |
| Exhibit 8 | Non-Retaliation Policy | 88 |
| Exhibit 9 | Leaves of Absence | 90 |
| Exhibit 10 | Daily Log | 94 |
| Exhibit 11 | Wellness Check Questions | 104 |
| Exhibit 12 | Appendix COVID-19 Infection Prevention | 117 |
| Exhibit 13 | Text Messages | 127 |

Page 4

INDEX (cont')

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 14 | E-Mails | 129 |
| Exhibit 15 | Trader Joe's Crew Member Incident Report | 134 |
| Exhibit 16 | E-Mails | 137 |
| Exhibit 17 | Lawsuit | 148 |
| Exhibit 18 | Handwritten Notes | 165 |



Page 5

P R O C E E D I N G S

THE VIDEOGRAPHER: Today's date is March 22nd, 2022. The time is 10:45. We're now on record.

JOSE AYALA, having been first duly sworn, testified as follows:

EXAMINATION

BY MS. EDWARDS:

Q. Could you please state your full name for the record, sir.

**A. Jose Napoleon Alas Ayala.**

Q. Ayala. Okay.

Mr. Ayala, my name is Kelley Edwards. I represent Trader Joe's in the lawsuit that you've brought against them. You understand, as we sit here today in this proceeding, that I represent a different side in your case than yours?

**A. Uh-huh.**

Q. Is that right?

**A. Yes.**

Q. Is that a "yes"?

Okay. And we've never met before just now this morning; is that right?

**A. Yes.**

Q. Okay. I'm here today to ask you a series of

Page 6

questions as part of your deposition, and I'm going to ask you to answer those questions. Before we do that, I'm just going to kind of talk about some of the ground rules and the procedures for today.

Have you ever had your deposition taken before?

**A. Yeah.**

Q. You have?

**A. Uh-huh.**

Q. How many times?

**A. Last night it was the last time I was ready.**

Q. Okay. I'll clarify.

MS. POTTINGER: Okay.

Q. (BY MS. EDWARDS) So by deposition I mean -- I mean a formal proceeding like this where you're put under oath --

**A. Oh.**

Q. -- and you're giving testimony.

**A. No.**

Q. Have you ever had that before?

**A. No.**

Q. Okay. So when you mentioned last night, was that just a meeting with your counsel to prepare for today or something like that?

**A. Yeah.**

Page 7

Q. Okay. So you've never given testimony like this in a formal court proceeding before?

**A. No.**

Q. Is that right?

**A. No.**

Q. Okay. So with that in mind, I'm just going to kind of tell you how it's going to go today.

**A. Okay.**

Q. I'm going to ask you a series of questions and ask you to respond to those questions. First of all, you understand that you have been placed under oath this morning; is that right? Do you understand what that means?

**A. Not exactly.**

Q. Do you know when the court reporter asked you to raise your right hand and -- and --

**A. Okay.**

Q. -- asked you to swear to tell the truth? Right?

**A. Yes.**

Q. Do you understand that -- what that means -- that that means you have promised to tell -- to give truthful and honest testimony in today's proceeding?

**A. Yes.**

Q. Okay. And you understand that by doing so, the

Page 8

testimony you're giving here today is just the same as if you were sitting in a courtroom in front of a judge?

**A. Okay.**

Q. You understand that?

**A. Yes.**

Q. Okay. If -- if I ask you a question and you don't understand it, please just let me know and I'll do my best to rephrase the question. I'm not trying to trick you. So if you think my question is tricky, just let me know and I'll try to ask a better question.

Can we agree to that?

**A. Yes.**

Q. Okay. We have a court reporter here, as you can see, that's transcribing, writing down everything that is said in this room today. And even though it's also being videotaped with audio, the most important thing for us to do today is to try to get a clean written record of everything being said. Because that's the -- the thing that -- that your attorney and I are going to go back and review when we're looking at what was said in today's deposition. And so for that reason, you and I need to both do our very best to try to help our court reporter here get a clean, clear written record of everything being said. Okay?

**A. Okay.**

Page 9

Q. And so for that reason, I'm going to do my very best to allow you to finish your answers to my questions before I ask the next question. And, likewise, I'll ask you to do your best to allow me to finish my questions before you answer. Can we agree to that?

A. Yes.

Q. Okay. And for the same reasons, it's important that we try to help our court reporter out by answering with words to questions. And so what I mean by that is if I ask you a yes-or-no question, I want you to answer yes or no instead of like uh-huh or uh-uh or nodding your head or shaking your head or that sort of thing because it's difficult for our court reporter to record those types of things versus the word yes or no.

Do you understand that?

A. Yes.

Q. Okay. And sometimes that's hard to forget; so I'll do my best to remind you. And if you don't give me a yes or no answer, then I'll ask you to clarify that for the benefit of our record. Okay?

A. Okay.

Q. If at any time you need a break, just let me know and I'll do my best to accommodate that. We're getting a late start; so I'm probably -- I'm just going to try to get as far as I can before we need to take a

Page 10

break for lunch. But if you get to a point where you need a restroom break or even a meal break, just let us know and we'll do our best to accommodate that. Okay?

A. Okay.

Q. The one thing that I'd ask is that if I've asked you a question, I'll expect you to answer that question before we take a break. All right?

A. Yes.

Q. Okay. Are you taking any medication today that might affect your memory or your ability to testify truthfully or accurately?

A. No.

Q. Have you taken any medication at all in the last 24 hours?

A. No.

Q. Okay. Is there any reason that you think a day other than today would be a better day for you to remember the events that are giving rise to your lawsuit in this case?

A. No.

Q. Okay. Without telling me what you talked about, did you meet with your lawyer to prepare for your deposition today?

A. Yes. I did.

Q. Okay. And you mentioned you met last night.

Page 11

Is that right?

A. Over the phone.

Q. Okay. How many times did you meet total with your lawyer to prepare for today?

A. Two I think.

Q. Okay. And for how long total did you meet to prepare for your testimony?

A. One. Last night.

Q. How many -- how long? Like how many hours?

A. Probably an hour.

Q. Okay. Did you review any documents to prepare for your deposition?

A. Yes.

Q. What documents did you review?

A. The petition. I forgot the name of the other one.

Q. Okay. What was the -- when you mean -- when you say "petition," do you mean like the actual lawsuit that was filed?

A. Yes.

Q. Okay. And can you describe the other document for me that you reviewed?

A. Interrogatory I think it's called.

Q. Oh. Interrogatories?

A. Uh-huh.

Page 12

Q. Your -- your answers to the questions we asked you, the interrogatory questions we asked you?

A. Yes.

Q. Okay. Anything else that you can remember reviewing to prepare for your deposition?

A. Well, I have a little note here. Just to refresh my mind.

Q. You have -- are you -- you're looking at notes?

A. Yeah.

Q. Okay. Can I ask you to put that to the side? Because it's important that I ask you to remember things from your -- best of your memory.

A. Okay.

Q. If you can't remember them and you need to look at your notes, let me know and we can -- we can see about accommodating that. But first I want to wee what you remember.

A. Okay.

Q. Okay?

So what -- were you going to talk about things that you reviewed? Is that the question that I'd asked?

A. It's just to -- you know, announce the date and just to go back to it. It's a little hard because --

Q. Yeah. It's hard for you to remember because it



Page 13

was a while ago?

A. Yes.

Q. Yeah. And we were talking about things that happened almost two years ago, right?

A. Correct.

Q. Yeah. So you've made some notes just to help you remember --

A. Yes.

Q. -- things a little bit better?

A. Yes.

Q. Okay. And so how did you make -- what did you use to make those notes?

A. What I use?

Q. Yeah. Did you use like other documents? Or were you just writing down your thoughts? What -- what --

A. It was --

Q. What did you reference to that make that --

A. Notes that me and my wife did so I can remember.

Q. Okay. And so you and your wife made -- made that together?

A. Yes.

Q. When did y'all do that?

A. She did it this morning.

Page 14

Q. Did she write it down for you?

A. Yes.

MS. EDWARDS: I'd like to see a copy of that. Would you mind producing it?

MS. POTTINGER: No -- I've already told him that you were going to want a copy.

MS. EDWARDS: Uh-huh. Yeah. If you wouldn't mind giving it to me, I can have a copy made --

MS. POTTINGER: He -- have him -- okay.

MS. EDWARDS: Yeah. And then -- just -- let's just go off the record for one minute.

THE VIDEOGRAPHER: All right. It's 10:53. We're off the record.

(Break taken from 10:53 a.m. to 10:55 a.m.)

THE VIDEOGRAPHER: It's 10:55. We're back on record.

Q. (BY MS. EDWARDS) Okay. Mr. Ayala -- did I way that correctly?

A. Yes.

Q. We're back on the record just after a brief break. I'm going to give you your notes back in just a second after we have photo copies made. So you said you and your wife talked about what, you know, certain facts about your case to help you prepare for today; is that right?

Page 15

A. Yes.

Q. Okay. Is there anything else that you did to prepare for your testimony today?

A. No.

Q. Was there anybody else that you talked to to help you prepare?

A. No.

Q. Other than your wife, have you discussed this case or the allegations in your case with anybody other than your lawyer?

A. No.

Q. What about the documents that have been provided in this case? Did you give those to -- did you show those to anybody else?

A. Only my wife.

Q. Okay.

MS. EDWARDS: Thanks, John. I'm going to set that here.

Q. (BY MS. EDWARDS) Anybody other than your wife?

A. No.

Q. Have you talked about your conversations with your lawyer with anybody other than your wife?

A. No.

Q. Other than this case, have you ever sued anybody before?

Page 16

A. No.

Q. Have you ever been sued before?

A. No.

Q. Have you ever filed for bankruptcy?

A. Yes.

Q. How many times?

A. Once.

Q. When was that?

A. Cannot really remember, but sometimes 2007 or '10, some -- somewhere like that.

Q. Okay. Where -- where was that case pending?

A. California.

Q. And is it closed now?

A. Yeah.

Q. Where -- do you remember where in California? Which county or part of the state?

A. It was Santa Clara County.

Q. Have you ever been a witness in a lawsuit?

A. Nope.

Q. Have you ever been involved in any other way in another lawsuit?

A. No.

Q. Other than today's proceeding, have you ever given a statement under oath for any reason?

A. No.

Page 17

Q. Like have you ever done a written statement where you signed your name and had somebody attest to it?

A. No.

Q. Like a notary or something? Okay.

Have you ever gone by any other name?

A. Yes.

Q. What other names have you gone by?

A. It was just Jose Alas.

Q. Just without the middle names? Is that what you mean?

A. Well, it was Jose Napoleon Alas. I was using my dad's last name before.

Q. Okay. How do you spell that last name?

A. A-L-A-S.

Q. When did you go by that name?

A. It was from middle school to high school.

Q. Why did your -- why did your last name change?

A. There was someone else with the same last name, and my credit score give to it him instead of me.

Q. So it caused some confusion?

A. Yeah.

Q. Yeah. So you changed your name just so you --

A. I changed my last name. That's the only thing I did.

Page 18

Q. And how did you choose Ayala for your last name?

A. That's my mom's.

Q. Your mother's name?

A. Yes.

Q. Did you legally change it?

A. No. I haven't. I legally haven't.

Q. What is your current address where you live?

A. I don't know it by heart, but it's 12655 West Houston Center Boulevard, Apartment 8206. ZIP code is 77082.

Q. And who -- do you rent or own that residence?

A. Rent.

Q. How long have you lived there?

A. A year.

Q. Who lives with you at West Houston Center Boulevard?

A. My wife and my two young kids.

Q. You said your two young kids?

A. Uh-huh.

Q. Is that a "yes"?

A. Yes.

Q. And what are their names and ages, your two -- your two kids?

A. My son's name is -- you want the whole full

Page 19

name?

Q. Uh-huh. I do.

A. My son's name is Jose Mourisio Tomie Ayala. He's only 3.

Q. Okay.

A. My daughter is Li- -- Liuai Natalia Ayala, and she's 5.

Q. Do you have any other children other than Jose and Liuai Natalia?

A. Yes. I have three -- three -- three daughters.

Q. What are their names and ages?

A. Ariana Lynn Ayala. She's 18. The other one is Tatiana Alexi Ayala. She's 16. My other daughter is Brinna Nickole Hernandez, and she's 12.

Q. And who is Jose's mother?

A. Dili. Well, her name is Dilrreng.

THE REPORTER: Green?

THE WITNESS: Dilrreng.

MS. POTTINGER: Spell the last name.

THE WITNESS: Her last name is Swei.

Q. (BY MS. EDWARDS) And --

THE REPORTER: What was her last name?

THE WITNESS: Swei.

Q. (BY MS. EDWARDS) Sueve like S-U-E-V-E?

A. S-W.

Page 20

Q. S-W.

And what about Liuai's mother? Who is that?

A. Liuai? Dili.

Q. Same --

A. Dilrreng. Dilrreng.

Q. The same --

A. Dilrreng is the mother for Jose and Liuai.

Q. And does she help you with financial assistance for the children?

A. For my two young ones, yes. But for the other ones, it just me.

Q. Okay. You mean the other three?

A. The other three others.

Q. Okay. But the two young ones, the mother helps provide --

A. Yeah. We go --

Q. -- regular care?

A. -- half and half.

Q. Who is Ariana's mother?

A. Her mom is named Laura Lynn. Well, she marry. Before her last name was Kayle.

Q. And Ariana's 18 now?

A. Yes.

Q. Does she have -- does she work on her own?

Page 21

A. She started working for Trader Joe's.

Q. Does she -- do you still provide financial assistance for Ariana?

A. Yeah.

Q. Even though she's --

A. Yes.

Q. Even though she's an adult now?

A. Yes.

Q. How much would -- she doesn't live with you, though?

A. No.

Q. How -- how much would you say you are providing for Ariana at this point?

A. Something probably 200 a month.

Q. Okay. What about Tatiana?

A. The same thing.

Q. And who is her mother?

A. Laura.

Q. And does she live with Laura?

A. Yes. They both do.

Q. Okay. What about Brinna? Who's her mother?

A. Her mother's Ivalia (phonetic) Hernandez.

Q. And does Brinna give with Ivalia?

A. Yes.

Q. Do you provide any support for --

Page 22

A. I got no communication with her.

Q. You don't have any --

A. No.

Q. -- communication with Brinna?

Where do Ariana and Tatiana live?

A. California.

Q. Any of them ever live with you at your current residence on West Houston Central Boulevard?

A. No.

Q. Where did you live before your current residence at West Houston Center Boulevard?

A. Well, I was living with my aunt. Can't remember the address. I think it was Win- -- Winchester I think was the street.

Q. So were you paying your aunt any rent to live there?

A. Yes.

Q. How much were you paying her?

A. 400.

Q. From -- that's 400 a month?

A. Yes.

Q. And how long did you live with your aunt on Winchester or wherever you think that may be?

A. Probably like eight months.

Q. And where did you live before you lived with

Page 23

your aunt --

A. In California.

Q. Okay. So -- and when you moved here, you moved in with your aunt?

A. Yes.

Q. Where were you living during the time that you worked for Trader Joe's in Houston?

A. With my aunt.

Q. Okay. The whole time?

A. Yes.

Q. And was your -- the woman you're married to now, was that your girlfriend at the time?

A. We're not legally married.

Q. Okay. So were y'all both living with your aunt at the time?

A. Yes.

Q. Okay. And what is her name?

A. My aunt?

Q. No. I'm sorry -- well, yeah. Tell me your aunt's name, I guess.

A. Her name is Morena.

Q. What's her -- what's her last name?

A. Salazar.

Q. Is she married?

A. No.

Page 24

Q. She live -- does she own that home where she lives?

A. Yes.

Q. And is it in her name?

A. I believe so. I just -- don't ask.

Q. Okay. And the woman that you call your wife now, what is her name?

A. Dilrreng.

Q. Okay. And that's the mother of your two children?

A. My two young ones.

Q. Okay. And you say you're not legally married --

A. No.

Q. -- but do -- you hold yourself out, you call -- you call yourselves married?

A. Yes. To make it easy.

Q. Okay. How long have you been together?

A. Seven years.

Q. Does she still work for Trader Joe's?

A. Yes.

Q. What store does she work at?

A. Cannot recall the number of the store, but I know it's off of West- -- Westheimer.

Q. Is it the store where she's always worked?

Page 25

A. Yes.

Q. What is your telephone number?

A. Area code (650) 387-2710.

Q. Is that your cell phone?

A. Yes.

Q. Is that the only number that you --

A. Yes.

Q. -- use?

What is your Social Security number?

A. 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.

Q. And what about your driver's license number?

A. I don't know it, but I have it.

Q. Okay. Do you have a Texas driver's license?

A. Yes.

Q. And do you -- did -- do you also have a California driver's license?

A. No.

Q. Or is it expired now?

A. Once I did the switchover, they took the California one.

Q. Okay. You mind pulling your driver's license out to tell us the address?

A. Well, I haven't currently changed the address.

Q. Oh, I'm -- yeah, I'm sorry. I meant the number --

Page 26

A. It has my --

Q. -- the number of the license.

A. You want me to give you the card or --

Q. No. Just read the number.

A. 45365330.

Q. Okay. Thank you.

What is the date and place of your birth?

A. El Salvador. May 26th, 1977.

Q. And when did you come to the US?

A. 1987.

Q. Okay. So were you 20 years old when -- or, no, you were 10 years old --

A. Yeah.

Q. -- when you came to the United States.

Was your -- did your family move here?

A. My mom -- well, yeah, everybody.

Q. Okay. And are you a US citizen now?

A. Residence.

Q. Okay. When did you obtain your residency?

A. '96.

Q. Are you a permanent -- you have permanent residency?

A. Yes.

Q. Do you have any other -- are there any other people who depend on you financially other than the

Page 27

children that you mentioned and also your wife?

A. No.

Q. Have you ever been married before?

A. No.

Q. Do you have any -- do you use a personal e-mail account?

A. Yes.

Q. What is that e-mail address?

A. It's jose4719@att.net.

Q. And do you have any other personal e-mail addresses that you use?

A. I have another one, but I hardly use it.

Q. What is that one?

A. It's snappy503@gmail.com.

Q. What e-mail address did you use during the time you worked at Trader Joe's?

A. That jose4719.

Q. And what did you use it for during that time?

A. My regular e-mails, stuff like that.

Q. Did you ever do job searches with that e-mail address?

A. Yes.

Q. So is that the e-mail address you would have used for job applications and that sort of thing?

A. Yes.

Page 28

Q. Do you have any social media accounts?

A. Yes.

Q. Which ones do you -- you use?

A. Facebook, Instagram, Snapchat.

Q. Any others?

A. No.

Q. What is your name on Facebook?

A. I think I just changed it to Jose I think. I don't remember.

Q. Just Jose?

A. Yeah. Jose Alas -- I mean Ayala.

Q. What about on Instagram? Do you know what your handle is?

A. I had a nickname. It was Gonzo503.

Q. What about on Snapchat?

A. The same.

Q. Gonzo503?

A. Yes.

Q. What about Twitter? Do you use that?

A. No.

Q. Have you ever posted anything on your social media accounts about Trader Joe's?

A. No.

Q. Did you go to high school?

A. Yes.

Page 29

Q. Where did you go to high school?

A. Menlo-Atherton High School in California.

THE REPORTER: Repeat that.

THE WITNESS: Menlo-Atherton High School.

Q. (BY MS. EDWARDS) And what -- where in California?

A. I believe it's Menlo Park.

Q. Menlo or meadow?

A. Menlo.

Q. Menlo?

A. Menlo Park.

Q. Did you graduate?

A. Yes.

Q. What year did you graduate?

A. '96.

Q. Did you attend any kind of college or schooling after high school?

A. No.

Q. Have you ever had any other kind of formal training or schooling after high school?

A. I did.

Q. What did -- what did you do?

A. Auto mechanic.

Q. Like a trade school?

A. Yes.

Page 30

Q. Where did you do that?

A. For -- it was for the school district. The name was Sequoia -- Sequoia -- I think it was Sequoia high school something. Too long.

Q. Did you do that during high school or after?

A. After high school.

Q. After high school?

A. Uh-huh.

Q. Okay. Is that a "yes"?

A. Yes.

Q. And so that was like a separate program that you attended following high school?

A. Yes.

Q. And did you get a certificate or something following that?

A. No.

Q. Was it any kind of -- did you finish the program?

A. No.

Q. Okay. How long did you spend in the program?

A. Probably two-and-a-half months.

Q. And how long was it supposed to be total, to the best of your recollection?

A. Six months.

Q. Okay. Anything else like that that you did?

Page 31

A. Just work.

Q. Okay. Have you ever been arrested before?

A. Yes.

Q. How many times?

A. Two.

Q. What was the first time?

A. What exactly are you asking me?

Q. What -- what -- tell me about the circumstance when you were arrested the first time. What happened?

A. Gun possession.

Q. Gun possession?

A. Uh-huh.

Q. Is that a "yes"?

A. Yes.

Q. Where was that?

A. That was in the city of East Palo Alto, yes, San Mateo County.

Q. Okay. And when, do you remember?

A. '98.

Q. What happened? Were you charged with a crime as a result of that?

A. Yes.

Q. What -- what -- what charge was brought against you?

A. I guess to say that I was walking with it on

Page 32

the street.

Q. Just possession?

A. Yeah.

Q. Of a firearm?

A. Yes.

Q. Were you convicted of that charge?

A. No.

Q. What happened? Was it dismissed?

A. It was a misdemeanor.

Q. Okay. So, I mean, what was the result of those charges brought against you?

A. It was my first offense.

Q. Okay. Did you have to pay a fine or serve any time?

A. Yeah. A month.

Q. You served a month?

A. Yes.

Q. Okay. Anything else that you had to do because of that?

A. Three years probation.

Q. And where did you serve time?

A. San Mateo County.

Q. Did you successfully complete the probation?

A. Yes.

Q. What was the second time you were arrested?

Page 33

A. Domestic violence.

Q. When was that?

A. 2014.

Q. Where did that occur?

A. That was in Santa Clara County.

Q. And what -- were -- were any charges brought against you as a result of that arrest?

A. Got reduced to I guess disturbing the peace.

Q. Okay. Were you convicted of that?

A. No.

Q. Were the charges dismissed?

A. Yeah. Yes. It was.

Q. Did you have -- have any time served because of that offense?

A. Yes.

Q. What's that?

A. Yes. I did.

Q. How long?

A. Three days.

Q. Three days. Okay. Was that three days following your arrest or three days sometime later?

A. Following the arrest all the way to the court.

Q. Okay. And you said that was in Santa -- Santa Clara County?

A. Yes.

Page 34

Q. Okay. Is there any other time that you've spent time in jail other than those two?

A. With immigration.

Q. Okay.

A. That was 2000- -- I think '11 or '12.

Q. When you were a child?

A. No.

Q. Oh. Oh. Okay. Different time.

A. Yeah.

Q. 2011 or '12?

A. Uh-huh.

Q. What happened with that?

A. They thought I was not legally here.

Q. Uh-huh.

A. But I was.

Q. Okay. So it was just a mis- -- misunderstanding?

A. From my understanding was their system's slow. By the time I renew my residence, to them was like they had to pick me up because I was not legally --

Q. Uh-huh. Okay. And how long did you spend in -- in jail for that?

A. One month.

Q. Where -- where did that occur?

A. I think the county is called Yuba County.

Page 35

Q. Okay. Any other time that you spent time in jail --

A. No.

Q. -- other than those three?

Okay. Any other time that you were arrested, other than what we talked about?

A. No.

Q. Has there -- is there any other crime that you've been convicted of other than the ones we mentioned --

A. No.

Q. -- or we talked about?

Okay. Have you ever participated in any kind of drug or alcohol rehabilitation program?

A. No.

Q. Have you ever received any treatment for an emotional or mental illness or injury?

A. No.

Q. Do you believe you've ever suffered an emotional or mental illness or injury?

A. I have.

Q. Okay. When do you believe you've suffered an emotional or mental illness or injury?

A. 2010 I think.

Q. Okay. What happened then?

Page 36

A. I was living by myself and working and taking care of my daughters in California.

Q. What makes you believe that during that time you suffered from an emotional illness or injury?

A. Well, California is expensive; so paying apartment by yourself and don't have money enough for your kids is...

Q. You need to take a break?

A. I'm all right.

Q. Okay. Did -- but you didn't receive any kind of -- you didn't seek any help or anything for that --

A. No.

Q. -- during that time?

Okay. Is there any other time in your life where you've felt that way?

A. No.

Q. Okay. You sure you're okay to go on? Or do you want to take a little break?

A. No. I'm okay.

Q. Okay. Mr. Ayala, other than Trader Joe's, have you ever been terminated from any other job?

A. No.

Q. Have you ever -- other than against Trader Joe's, have you ever filed a complaint of -- of -- or a charge against one of your former employers?

Page 37

A. No.

Q. Have you ever filed any -- any kind of complaint with a government agency?

A. No.

Q. Have you ever made an internal complaint with an employer, like to HR or something?

A. No.

Q. Other than your -- your wife, do you have any relatives who work for Trader Joe's?

A. My two daughters.

Q. Okay. Where do they work?

A. And I have a cousin, too, that works.

Q. Okay.

A. They work in California. Modesto.

Q. Do they work in the same store?

A. Yes.

Q. And what's your cousin's name who works for Trader Joe's?

A. Danielle Joco.

THE REPORTER: What was the last name?

THE WITNESS: Joco.

THE REPORTER: Could you spell that?

THE WITNESS: J-O-C-O.

Q. (BY MS. EDWARDS) And where does Danielle work?

A. The same store. Modesto.

Page 38

Q. In California with your --

A. Yes. California.

Q. With your daughters?

A. Yes.

Q. Okay. Any -- any other relatives that you have that you know of that work for Trader Joe's?

A. Well, I have a cousin. His wife work in the same store, but not really sure if still works.

Q. Okay. What's your cousin's wife's name?

A. Can't even remember right now.

Q. Okay. Somebody at that same store?

A. Yes.

Q. Okay. Anybody else that you can think of?

A. My daughter's mom works there, too.

Q. Okay.

A. Her name is Laura.

Q. Okay. Anybody else?

A. No.

Q. Do you have any friends that you keep in contact with who work for Trader Joe's?

A. Yeah. Some. His name is Mark.

Q. Okay. Do you know Mark's last name?

A. Dunn.

Q. Where does Mark work?

A. He was working here in Austin.

Page 39

Q. In Houston? Is that what --

A. In Austin.

Q. Oh, in Austin.

And how do you know Mark?

A. From California.

Q. Okay. Any other friends that you have that currently work for Trader Joe's?

A. No.

Q. Did you keep any documents or records relating to your employment at Trader Joe's?

A. As far as --

Q. Any papers that they gave you or anything?

A. Well, I don't understand exactly what you're asking me.

Q. So you know sometimes at jobs they give you -- they'll give you paperwork like handouts or, you know, letters or something like that, just -- pieces of paper that have information about the company?

A. They did, but I don't -- I don't have them anymore.

Q. Okay. Did you keep -- you didn't keep any of that stuff?

A. No.

Q. What about, like, your paychecks or, you know, pay stubs or anything like that? Do you have any of

Page 40

those kinds of documents?

A. I got some old ones, but everything else paperless.

Q. Okay. Where do you keep those old pay stubs?

A. I think I have them in storage.

Q. Have you looked for those?

A. No.

Q. Okay. Have you done any kind of search around your house or in your storage to see if you have any papers related to your time at Trader Joe's?

A. Well, I did -- I was able to log in to my account, Dayforce that we have for Trader Joe's.

Q. Uh-huh.

A. And I just got the handbook --

Q. Okay.

A. -- describing the jobs.

Q. So is that when you were working there that's how you would get documents?

A. Yeah.

Q. Okay. But you don't have access to that now?

A. No.

Q. Okay. But recently, since you filed your lawsuit, have you looked around your home or in your storage to see if you have anything about your employment?

Page 41

A. No.

Q. Okay. Why haven't you done that?

A. I mean, to clarify, if you ask me for review, stuff like that, I don't --

Q. Yeah. I just want to know if you've even looked around to see if you have anything.

A. I just put stuff anywhere, like -- but no.

Q. You don't have, like, a system?

A. No.

Q. Is that what you're saying?

So like you just have like piles of paper and stuff. You would have to look through all that?

A. Uh-huh.

Q. You don't have like files or something. Is that what you mean?

A. Yeah.

Q. Yeah. Okay. But I guess my question is, have you done anything like searched around or anything just to know -- I know you don't think you have anything, but have you looked to make sure that you don't have -- actually have anything?

A. This -- when I started this, probably I did. But to look for the handbook, just to figure out -- well, to explain to my lawyer how Trader Joe's work, the type of work we do. That's it.

Page 42

Q. Okay. Yeah. Okay. What about -- did you keep any notes or calendars when you worked at Trader Joe's?

A. No.

Q. How did you keep up with your schedule? Did you write it down anywhere? Put it in your phone? Anything like that?

A. I would just check my Dayforce. My schedule never changed. And that's it.

Q. Okay. Did you keep like a diary or a journal around that time? Anything like that?

A. No.

Q. Have you given your attorney any kind of documents related to your employment at Trader Joe's?

A. Yes.

Q. What -- what documents have you given her?

A. What we just talking about, handbook, text message that I had between my current manager, the HR.

Q. Uh-huh.

A. That's pretty much it.

Q. So you have -- you have a copy of the handbook?

A. No. We took it off Dayforce.

Q. Okay. But you printed it -- did you actually go on to Dayforce and print it?

A. We took like pieces here and there, like what the job description was from crew member to management.

Page 43

Q. Okay. When you say "we" who are you talking about?

A. Me and my wife.

Q. So did you do that to get documents for this case?

A. Yes.

Q. Okay. So was that after your employment was terminated?

A. Yes.

Q. So was it actually then your wife who went on to the system to print that stuff out for you?

A. Me.

Q. Okay. Did you go on -- did you still have access to the system at that time?

A. I had a little bit before they took -- they block -- the block my login.

Q. Okay. How long after you were terminated did they block your login?

A. Within -- took them two days, I think.

Q. Okay. So was it during those two days that you went on and printed things out?

A. Yes.

Q. Okay. So what all did you print off? Just the handbook? Or were there other things, too?

A. No. Just the handbook, like the job

Page 44

descriptions.

Q. Handbook and the job -- your job description or a bunch of job descriptions?

A. Yes. Because what we did encourage us as crew members and mates.

Q. Okay. And you've given those documents to your lawyer?

A. Yes.

Q. Did you ever have your wife go on to the system and --

A. No.

Q. -- print out anything for you?

A. No.

Q. Is there anything else that you got off the system, anything else -- any other documents related to Trader Joe's --

A. No.

Q. -- that you gave to your lawyer? Anything else you can think of?

A. No.

Q. Okay. Without telling me what you talked about, when was the first time that you spoke to a lawyer about your employment at Trader Joe's?

A. Probably that following week when I got terminated.



Page 45

Q. How long after you were terminated? Or was it before?

A. Probably four days after I think.

Q. Four days after?

A. Uh-huh.

Q. Is that a "yes"?

A. Yes.

Q. And how did you -- what made you want to contact a lawyer?

A. I didn't believe the way I was treated was fairly.

Q. Okay. And how -- how did you find your lawyer?

A. Internet.

Q. You just did a search?

A. Uh-huh.

Q. Is that a "yes"?

A. Yes.

Q. What did you search for?

A. Legal advice.

Q. Just legal advice or something more specific than that?

A. Yeah. Pretty much legal advice and see if I can get my job back. That's pretty much what I was looking for.

Q. Okay. And was that Ms. Pottinger that you

Page 46

contacted at that time or somebody else?

A. No. Just her.

Q. Do you think you have any e-mails that were about your employment at Trader Joe's?

A. What kind of e-mails?

Q. Anything about e-mails with -- e-mails with Trader Joe's or e-mails with other people about Trader Joe's?

A. No.

Q. Have you gone back and looked to see if you have that, you have anything like that?

A. The only e-mails I have is the HR.

Q. Okay.

A. That's it.

Q. Have you gone through -- back through your e-mail to look for those e-mail -- e-mails with HR?

A. Yes.

Q. You have?

A. Uh-huh.

Q. Did you find them?

A. Yes.

Q. Okay. And what did you do with those?

A. Well, they're on my phone; so --

Q. They're on your phone?

A. Yes.

Page 47

Q. Did you print them out or send them to anybody?

A. Send them to her.

Q. You did?

A. To my lawyer.

Q. How many e-mails did you find?

A. Just one, just we were replying back and forth.

Q. The one -- the one e-mail with HR?

A. Yes.

Q. What did you do to search your e-mail to find that?

A. I put a tag.

Q. You put a what?

A. A tag.

Q. A tag on -- what kind of tag?

A. Like a flag on the e-mail.

Q. Okay. But, I mean, how did you find it in the first place? Did you search -- how did you -- did you search somehow through your e-mail to find it?

A. Well, if I put a tag, it goes to a specific file.

Q. Uh-huh.

A. And I just opened the file, and there is all the things that I saved.

Q. Okay. So it's just a general folder where you save things?

Page 48

A. Yes.

Q. So when did you save that e-mail? Right when you got it or sometime later?

A. Right when I got it.

Q. Okay. Did you know that you were going to need it?

A. Yes.

Q. What made you think you were going to need that e-mail later?

A. Because it was the wellness check; so I need to save it.

Q. Okay. Did you know at that time that you were probably going to bring a lawsuit against Trader Joe's?

A. Not really.

Q. Okay. So what about it made you think that was important enough to save?

A. So I can be more clarified of what they were asking me as I was answer them.

Q. Okay. Okay. Have you gone back through your e-mail to look and see if you have any other e-mails with anybody else from Trader Joe's?

A. No.

Q. Okay. Why -- why haven't you done that?

A. I don't communicate with anybody in e-mails.

Q. What about before that time? Had you had any

Page 49

e-mails with -- with HR or anybody else at Trader Joe's before that one e-mail?

A. No.

Q. Okay. Did you have a Trader Joe's e-mail account?

A. No.

Q. How did you communicate with people, like your -- your coworkers and stuff? About your shift or if you were running late, who would -- how would you communicate that to people?

A. Through Dayforce.

Q. Okay. Is that like an app that you had on your phone?

A. Yes.

Q. Do you still have that on your phone?

A. No.

MS. EDWARDS: Let's just take a short restroom break.

THE VIDEOGRAPHER: It's 11:34. We're off the record.

(Break taken from 11:34 a.m. to 11:57 a.m.)

THE VIDEOGRAPHER: It's 11:57. We're back on record.

Q. (BY MS. EDWARDS) All right. Mr. Ayala -- Ayala, we're back on the record after a break. Do you

Page 50

understand you're still under oath?

A. Yes.

Q. Okay. You told me before you graduated high school in '96. Is that right?

A. Yes.

Q. And when did you go to work for Trader Joe's the first time?

A. Early 2000.

Q. Okay. 2000?

A. Uh-huh.

Q. Is that a "yes"?

A. Yes.

Q. What -- what job -- what was the first job you had after high school? What type of work did you do?

A. It was a bakery called Rolling Pin.

Q. Called what now?

A. Rolling Pin.

Q. Rolling Pin? That's cute.

A. Yeah.

Q. In California, I presume?

A. Yes.

Q. How long did you work there?

A. A month.

Q. Okay. What did you do after that?

A. Worked for an agency.

Page 51

Q. An agency?

A. Uh-huh.

Q. What kind of agency?

A. Work agency.

Q. A what?

A. A work --

Q. A --

A. They would search work -- I mean, jobs for you.

Q. Okay. So they'd send you out to jobs when they found it?

A. Yes.

Q. How long did you do that?

A. For a year.

Q. Okay. What did you do after that?

A. Work with one of my cousins.

Q. Doing what?

A. Painting. House painting.

Q. Okay. How long did you do that?

A. A year.

Q. Okay. And then what did you do after that?

A. Work for another friend from the family. Gardener.

Q. Okay. How long did you do that?

A. Eight months.

Q. Okay. And what -- what did you do after

Page 52

working as a gardener?

A. Stay home.

Q. For how long did you just stay home?

A. I think until I found Trader Joe's.

Q. Okay. So how -- how long would you -- would you say that was about that you were staying home in between jobs?

A. Really cannot recall that.

Q. You can't remember?

A. Uh-uh.

Q. It sounds like -- and so you graduated high school in '96, and you went to work for Trader Joe's in 2000.

A. Uh-huh.

Q. Right? Is that a "yes"?

A. Yes.

Q. So you told me about three years of jobs that you had during that time.

A. Yes.

Q. Does that mean -- does that sound right that you would have just stayed home without working for about ten years?

A. Well, I was working for another, like -- a senior home, and my cousin was the manager. That was just for a little bit, not too long.

Page 53

Q. Okay. So that was just kind of on the side, or...

A. Just to start, like -- so that way my mom wouldn't be screaming at me.

THE REPORTER: Could you repeat that?

THE WITNESS: Just to get my life started, you know.

Q. (BY MS. EDWARDS) Uh-huh.

A. Like, my mom was pushing me to find a job, but sometimes you don't find the correct job.

Q. So were you living with your parents during that time?

A. Just my mom. Single parent.

Q. Okay. So you would some of the time work at that old folks' facility. Do you remember the name of?

A. I think it used to call -- I think it's still called Little House.

Q. Little House?

A. Uh-huh.

Q. Okay. Do you remember where it's located?

A. The city's called Menlo Park.

Q. Okay. Any other places that you worked during that time period that you can remember?

A. Well, most of them was just the agency they would send me different jobs. It would be two weeks

Page 54

here, three weeks here, one week here.

Q. Uh-huh.

A. And that's pretty much --

Q. Okay. But you said you did that for a year. Is that right?

A. Uh-huh.

Q. Was that a "yes"?

A. Yes.

Q. Okay. So other than -- other than that, during that window of time before you went to work for Trader Joe's, did you -- was -- do you remember any other significant jobs that you had?

A. No.

Q. So then is it -- was your job at Trader Joe's, was that like your first --

A. Real job.

Q. -- big job?

Yeah, real job -- I was trying not to say it like that.

A. To me that was my real, real, real job. I can say --

Q. Uh-huh.

A. -- and -- and extremely loud say that's my real job.

Q. Okay. So then how did you hear about Trader

Page 55

Joe's?

A. A cousin of mine used to work there.

Q. Okay. And was that the cousin you talked about before or a different cousin?

A. Different cousin.

Q. Okay. And what was that cousin's name?

A. Henry Salazar.

Q. Okay. And did your cousin suggest that you apply for work there?

A. I asked him if they were hiring, and he said they're taking applications. And he was -- he earned the respect and the trust of his manager -- store manager and assistant managers that he said that -- he asked someone else they can come and work.

Q. Uh-huh.

A. And the only thing was that just to have an opportunity. And I told him -- tell him what happened to me because at that time, Trader Joe's was asking if you're convicted of a crime. So I told my cousin first to tell his manager about my story, and then say to come in, fill out application. And I wrote exactly what happened to me.

And I think two days later, they told me to come in, fill out the paperwork. And then the third day, I think, I was already working for Trader Joe's.

Page 56

Q. Okay. All right. Do you remember filing out a job application with Trader Joe's?

A. Yes.

Q. Okay. I'm going to show you a copy of it.

(Exhibit 1 marked.)

Q. (BY MS. EDWARDS) So I'm going to mark this -- or I am marking this as Exhibit 1 to your deposition. Take a look at that.

Do you recognize this document, Mr. Ayala?

A. Yes.

Q. Okay. Do you recognize this to be your application for employment the first time you went to work for Trader Joe's?

A. Yes.

Q. Okay. And is that your signature on the bottom of the second page?

A. Yes.

Q. And it's dated February 16th, 2000; is that right?

A. Yes.

Q. Do you remember what position you were applying for?

A. Well, stocking.

Q. Okay. Was it -- is it -- were you just sort of applying for whatever they might have had available at

Page 57

the time?

A. Well, yes. Well, my cousin kind of explained me what they did there.

Q. Uh-huh.

A. So I was open for it from being cashier, stocking, customer service, cleaning. Trader Joe's would do everything.

Q. Okay. And if you'll look at the -- where the section that says "employment history."

Do you see that?

A. Yes.

Q. It lists a couple jobs that you didn't mention just now; so I want to go through those with you. The first one is DHL. Do you remember working for them?

A. Yes.

Q. Was that one of the jobs that you -- you got through the work agency, or is that something separate?

A. Agency.

Q. Okay. So that -- and that says you worked there in 1999.

A. Yes.

Q. Is that right? So were you doing that agency work closer to the year 2000?

A. Yes.

Q. Okay. I was confused earlier because it seemed

Page 58

like you did it shortly after you graduated high school, but it was -- it was later during that window of time; is that right?

A. Yes.

Q. Okay. And then you also list CDS Loophole?

A. Yes.

Q. San Carlo?

A. Yes.

Q. Is that also a job through that agency, or is that something -- something different?

A. Agency.

Q. Okay. What kind of company is that?

A. It's no longer there. But it was -- what I remember was you got aluminum parts that goes to some machine -- machinery to the hospitals.

Q. Uh-huh.

A. So we had to sand -- sand them, clean them, and that's it.

Q. Okay. So what were you doing for them?

A. Cleaning and sanding parts.

Q. Okay. And do you see in this section, the top of the section that says "employment history"? See that? The title of the section where it says "employment history"?

A. Yeah.

Page 59

Q. See that?

And it says: "Please account for the last ten years."

A. Yes.

Q. Do you see that instruction?

Okay. You only listed about four months of employment in that section. Does that mean that you didn't have any other notable jobs within the rest of those ten years?

A. To my knowledge, it just said didn't matter the other ones. So...

Q. Okay. So somebody told you that?

A. Yeah.

Q. Okay. All right. You can set that to the side. Did somebody -- do you remember how you submitted this application?

A. I went in the store.

Q. Okay. And did you interview with anybody at that time?

A. I met the captain, but I don't know where he is anymore.

Q. Okay. Was that -- you met the captain. Did you actually have an interview?

A. I had a work interview, but it was not with him. It was with I think his -- I think they call them

Page 60

merchant because the history of Trader Joe's different than what it is now. The way things have broken down when I started to now is different.

Q. Okay.

A. So we had the captain, first mate, merchant super merchant, novitiate.

THE REPORTER: What?

THE WITNESS: Novitiate. Like I guess new -- like a new -- someone getting promoted. And then you have your crew. So I talked to his I think merchant.

Q. (BY MS. EDWARDS) Uh-huh.

A. That's who give me the -- the interview --

Q. Were you --

A. -- or the job.

Q. Sorry. Go ahead.

A. No. That's it.

Q. Were you offered a job right then?

A. Yes.

Q. Okay. So you -- you went in and turned in your application, and they hired you right that same day?

A. Two days later.

Q. Okay. So did you call a later saying that you were going to be hired?

A. Yes.



Jose Ayala

Page 61

Q. Okay. And then when did you actually start working there?

A. It was February 17th, 2000.

Q. And what was your position when you went to work there?

A. Stocking.

Q. That's what you were doing, but do you know what your title was?

A. Crew member.

Q. Crew member.

Okay. And how long did you work at Trader Joe's that first time?

A. That was in -- that location, from 2000 to 2003.

Q. Okay. And then did you move to a different location?

A. Yes.

Q. Right away? Was there any break in between?

A. Right away.

Q. Okay. What was the second location?

A. That was Menlo -- Mountain View.

Q. Okay. And were you still a crew member?

A. Yes.

Q. And how long did you work at Mountain View location?

Page 62

A. I think it was another year or so.

Q. Okay. And then did you move locations again?

A. Yes. I got promoted.

Q. Okay. What did you get promoted to?

A. Management.

Q. What was the -- what was your job title?

A. That's the thing that I cannot pronounce the word. It's novitiate. Like it's -- I have a hard time pronounce that word.

Q. Okay.

A. But that's -- you're like the lowest manager on the rankings.

Q. Okay. And how long -- were you still at that same --

A. No.

Q. -- location?

A. I moved to another store.

Q. Okay. Which was store was that?

A. That was in Fremont.

Q. Freeman?

A. Fremont.

Q. Okay. And how long did you work at Freeman location?

A. That was for another probably I think a year and probably five months.

Page 63

Q. Okay. And why did you leave?

A. I moved to another store.

Q. Okay. What was another -- the other store?

A. That was Westgate that's the area of San Jose. That's the county of Santa Clara.

Q. And what was your reason for moving to that store?

A. Well, with the history of Trader Joe's is, depending your region manager would like to make his managers expand or grow. Let's put it this way.

Q. Uh-huh.

A. So you get to work with different people if you ever want to become a captain for your own store.

Q. Okay.

A. So --

Q. So they were moving you around to just get you a little more experience?

A. Yes.

Q. Okay. That was your understanding anyway?

A. Yes.

Q. All right. And then -- so how long did you stay at that --

A. That was another year or so.

Q. Okay. And then how long -- or why did you leave that location?

Page 64

A. I transferred to another store as a manager.

Q. Okay. Still in the same role?

A. Yes. This one was on Sunnyvale.

Q. Was what? I'm sorry?

A. Sunnyvale.

Q. Sunnyvale?

A. Yes.

Q. And how long did you work at the Sunnyvale location?

A. Not that long because I had some personal stuff going on, and I collect my residence.

Q. Uh-huh.

A. So I had to do a voluntary quit.

Q. You had to do a voluntary quit?

A. Yes.

Q. Was that when you had to go to jail for the gun possession?

A. No.

Q. That was something different?

A. Different.

Q. So then when did you voluntarily quit?

A. I think it was probably 2010 or '9. Something -- cannot recall when exactly my residence expired.

Q. Do -- does it sound right that it would have

Page 65

been 2007?

A. Something like that.

Q. Okay. So you say you voluntarily quit because you were working out your residence situation?

A. I let my residence expire.

Q. Oh, okay.

A. My legal residence.

Q. Okay. Gotcha.

A. So I took six months to get it back.

Q. Okay. And then after that, did you reapply at Trader Joe's?

A. They were holding my spot.

Q. Okay.

A. But the according to the region -- the region manager, I had a different approach. So I stepped down from manager to crew again.

Q. And do you remember having to reapply for that? Submitting a new application --

A. For that, no. No.

Q. Okay. Let me -- let me show you this, and -- where did I put my stickers? -- maybe that will help you remember a little bit. Because I got a second job application for you that I'm going to show you.

(Exhibit 2 marked.)

Q. (BY MS. EDWARDS) So I'm going to hand you

Page 66

Exhibit 2.

Take a look at that and tell me if you remember submitting that application.

A. Yes.

Q. Okay. When did you submit that application?

A. That was, I think, 2011.

Q. Well, if you look at the last page, do you see the date on there?

A. 2007. Yeah.

Q. So what's the date that it shows there?

A. 2007.

Q. Okay. So do you remember submitting this application in 2007?

A. Yes.

Q. Okay. And where -- why did you submit this application in 2007?

A. Because I was in jail on that time.

Q. Okay. So was -- this was after the gun possession charge?

A. No. That was immigration.

Q. This was following the immigration --

A. Yes.

Q. -- jail?

Okay. All right. So did -- is -- is that what you were telling me about when you had to

Page 67

voluntarily quit because you were taking care of the immigration situation? Or was that a different time?

A. That was different.

Q. Okay.

A. Different time.

Q. So you -- you were arrested and put in jail for the immigration thing; so you weren't able to go to work?

A. Yes.

Q. Okay. And then did they terminate your employment because of that?

A. No. They said that they're going to put, like -- I think they tried to put like a leave of absence. But because I guess I left the job -- abandoned my job.

Q. Uh-huh.

A. So then that's pretty much -- I got -- had to get a rehire again.

Q. Okay. So how long then was it that you were out of work for that time in 2007?

A. Six mo- --

Q. To the best of your recollection?

A. Six months.

Q. About six months?

A. Yes.

Page 68

Q. Okay. And so then when you went back to work in 2007 after this application, what position did you go back to?

A. Crew member.

Q. Okay. So at -- at that point, when you went back, you went back down to the crew member position?

A. Yes.

Q. Okay. And then you -- you left again for another period of time about a year later; isn't that right?

A. No. Not that I recall.

Q. Okay. When do you remember that you left the next time?

A. It was only that one time.

Q. Okay. Well, I'm going to show you this other application that I have that -- for you that's another application.

(Exhibit 3 marked.)

Q. (BY MS. EDWARDS) Take a look at that one, if you will.

Do you remember this?

A. Yeah. I do.

Q. Okay. Tell me why you had to apply again at this one?

A. Well, this one here, when I got back from



Page 69

immigration.  The other one was I guess we had to rehire me when I left for six months.

Q. Okay.  So the last one that we looked at was when you --

A. Voluntary quit.

Q. Because of the immigration --

A. Yes.  My residence --

Q. -- jail --

A. Residence.

Q. Okay.  That one was the residence?

A. Yes.

Q. This one was because you were in --

A. Yeah.  This one --

Q. -- jail for the --

A. -- because of jail.

Q. Okay.  So this the second time.  And then -- so you weren't able to go to work --

A. Yes.

Q. -- because you were in jail, right?

A. Yes.

Q. Okay.  So then when you were released, then you applied again; is that right?

A. Yes.

Q. Okay.  And so then did you -- was -- did you go back then to the crew member --

Page 70

A. Yes.

Q. -- position again?

Okay.  And then how long to the best of your recollection, how long did you work there this time until you left?

A. This -- that when I came back, I went to the first application here, the location 69, the Menlo Park store.

Q. Uh-huh.

A. I went there because that's where my history with Trader Joe's started.  I was there probably a year or so.  And then I went back to Sunnyvale store because by that time I was living in a different place.  Then I moved to live in Sunnyvale.

Q. Okay.

A. And the store was 10 minutes from where I was living.

Q. And then how long did you work at the Sunnyvale store?

A. Probably like 10 years I think.

Q. Until about when?

A. Until 2018.

Q. 2018?

A. Uh-huh.

Q. Is that a "yes"?

Page 71

A. Yes.

Q. You didn't have a break in there --

A. No.

Q. -- during some period of time?

A. No.

Q. Okay.  So from then -- to the best of your recollection, from then -- from that application in 2008 until about 2018, you worked at that store?

A. No.  I was Menlo Park, and then I went to Sunnyvale.

Q. Okay.  That whole time, though, you worked at one of those two stores?

A. Yes.

Q. Okay.  And then why did you leave in 2018?

A. I got promoted again to management.

Q. Okay.  Still at the Sunnyvale store?

A. I went to Mountain View store.

Q. To what?

A. Mountain View.

Q. Okay.  And that was in 2018?

A. Uh-huh.

Q. Is that a "yes"?

A. Yes.

Q. Okay.  And then how long did you stay in the Mountain View store?

Page 72

A. Until 2019.

Q. Okay.  What happened in 2019?

A. I move over here.

Q. You moved to where?

A. Texas.

Q. Okay.  And what made you decide to move to Texas?

A. We can visit.  Gas is cheaper.  Living's a little more cheaper.  And my pay rate, it was better for my kids' life and my life, future out here --

Q. Okay.

A. -- instead.

Q. And so did you ask to be transferred to Houston market?

A. Yes.

Q. Okay.  Who did you approach to ask about that?

A. My cap -- my old captain.

Q. Who was that?

A. Gus.

Q. Your -- and Gus was your captain at the Mountain View store?

A. Yes.

Q. Okay.  And what was the next step in your transfer to Houston?

A. Either had to wait a year or had to step --



Page 73

voluntarily step down and move out here as a crew member.

Q. Okay. And which did you choose?

A. Step down.

Q. Okay. Did you have to interview for the job out here?

A. No.

Q. And did they assign you to a store?

A. Yes.

Q. Who communicated that to you?

A. Well, captain to captain, they -- when they could to each other, they had to send my employee records out here in Texas. And then couple probably weeks or so, I got to transfer.

Q. Okay. But who told you about all of those steps? Were you working with HR or still communicating with Gus as your captain?

A. Gus.

Q. Okay. And do you remember when you started at the Houston location?

A. It was 2019. It was in October. October I think 28th.

Q. Okay. And what store did you move to in Houston?

A. It was off of Voss.

Page 74

Q. Okay. Voss near San Felipe?

A. Yes. South Voss I think it's called, the street.

Q. Okay. And you said you went to work there as a crew member?

A. Yes.

Q. Was that a full-time or part-time position?

A. Well, on the records at Trader Joe's, they considered us a part-time while you're working full-time.

Q. Okay. And were you assigned to a particular department in the store?

A. Yeah. I had a side -- a section. I was in charge of a section.

Q. Okay. What section was that?

A. The meat department.

Q. And who was your supervisor at the Voss location?

A. Dustin.

Q. What was Dustin's position?

A. Captain.

Q. Okay. How did you get along with Dustin?

A. I thought okay.

Q. Do you think Dustin was fair to you?

A. I thought.

Page 75

Q. Did he ever do anything or say anything to you that you thought was unfair or inappropriate?

A. They terminate me.

Q. Okay. Other than that, did he ever do or say anything to you that you thought was unfair or --

A. No.

Q. -- unprofessional?

A. No.

Q. Were you paid an hourly rate in your role as crew member at the Voss location?

A. Yes.

Q. Do you remember how much it was?

A. I did get a raise; so when I came to Texas was 24.75. And then I had a quarter raise; so I was 25.

Q. Okay. 25 an hour?

A. Uh-huh.

Q. Is that a "yes"?

A. Yes. Yes.

Q. And about how many hours a week did you work?

A. 40. Well, 38.

Q. Did you receive benefits in your role?

A. Yes.

Q. What kind of benefits did you receive?

A. Dental and health. And vision I believe.

Q. Were you ever given performance evaluations

Page 76

during your time at Trader Joe's?

A. Yes.

Q. Okay. I'm going to show you one of them. Here it is.

(Exhibit 4 marked.)

Q. (BY MS. EDWARDS) I'm going to hand you what I'm marking as Exhibit 4 to your deposition, if you'll look at that, if you will.

MS. POTTINGER: I'm going to keep these in order for you.

MS. EDWARDS: There you go.

MS. POTTINGER: Thank you.

Q. (BY MS. EDWARDS) Do you recognize this to be a copy of your 2020 performance review?

A. Yes.

Q. Okay. And that's where you say -- if you see at the bottom of the first page, it says: "Congratulations. Your new rate of pay is $25."

A. Yes.

Q. Okay. So that confirms that that was your hourly rate at that time?

A. Yes.

Q. And who completed this review, to the best of your knowledge?

A. I think Dustin.



Page 77

Q. Okay. And how was it given to you? How was it delivered to you?

A. Well, he got in contact with previous captain, Gus. It was either he would write it or Dustin would write it. So I guess they decided between Dustin to write it for me.

Q. Uh-huh.

A. And the way he approach was, you're doing good here. Everybody appreciate you. So to me it sounded good. But then he was like, I guess you got a quarter.

I was like, okay.

Q. What did you say? "I guess you got a quarter"?

A. Yeah, he said I got a quarter. It didn't seem like he was happy about it.

Q. What does that mean? What did that mean to you?

A. I don't know.

Q. Is that like a quarter raise maybe?

A. Yeah.

Q. Is that what you mean?

A. Uh-huh.

Q. Okay. So you -- you got a raise of like 25 cents an hour?

A. Well, I got the quarter because I was basically, when I move out here, I was 24.75.

Page 78

Q. Okay.

A. And because I moved from California here, since like I had improve too much -- myself to him to receive that raise.

Q. So were you -- are you saying you weren't happy with that raise?

A. I don't think he was.

Q. Okay.

A. I was happy.

Q. You were happy?

A. Yeah.

Q. But he wasn't?

A. He didn't seem like he was.

Q. Okay. Well, in terms of the actual review itself, is there anything on here that you disagree with in terms of the ratings or the comments?

A. No.

Q. Do you think the review is fair?

A. Yes.

Q. Okay. Since -- it's -- to me it looks like a positive review. Would you agree with that?

A. Yes.

Q. All of the boxes are checked "as meets expectations," right?

A. Yes.

Page 79

Q. And then in the comments section, he has some -- some nice things to say about your work. Wouldn't you agree with that?

A. Yes.

Q. Okay. And then he also gives you a couple areas of suggestions where you could perform, you know, even -- even better; is that right?

A. Yes.

Q. Okay. And then if you look at the second page of that document, that's -- do you remember acknowledging that you received it --

A. Yes.

Q. -- on the computer?

A. Yes.

Q. Is that what this is?

A. Yes.

Q. Okay. Now as an employee of Trader Joe's, you were aware that the company had certain policies and procedures that applied to your employment; is that right?

A. Yes.

Q. And you mentioned before that you knew how to access the company's employee handbook --

A. Yes.

Q. -- through the work [sic] force?

Page 80

And -- and you knew that it was your responsibility to know and abide by those policies and procedures; is that right?

A. As I was told, yes.

Q. Okay. And -- and throughout your employment with Trader Joe's, they issued updates to that handbook and new policies as well during certain times; is that right?

A. I think so.

Q. And periodically you were asked to sign acknowledgements that you received and had access to the handbook, correct?

A. No.

Q. You don't remember doing that?

A. Uh-uh.

Q. Let me show you one example. And then you may -- maybe that will help you understand what -- what I'm talking about.

(Exhibit 5 marked.)

Q. (BY MS. EDWARDS) So I'm going to hand you this that is Exhibit 5 to your deposition. Take a look at that, if you will. Do you see that at the top of this it says: "Acknowledgement of receipt of crew member handbook"?

A. Yes.



Page 81

Q. Then it says: "This is to acknowledge that I have received a copy of the crew member handbook and understand that it contains important information on Trader Joe's general personnel policies and all my privileges and obligations as a crew member."

Did I read that correctly?

A. Yes.

Q. So -- and then is that in your signature --

A. Yes.

Q. -- at the bottom?

And it's -- this particular one is dated November 11th, 2011; is that right?

A. Yes.

Q. Okay. So you remember signing these from time to time that were acknowledgements that you had received the handbook?

A. No. You only do it once.

Q. Oh. You only remember doing it one time?

A. Yes.

Q. Okay. But do you remember signing this then --

A. Yes.

Q. -- when you received it?

Okay. So does that help you refresh your recollection about what I'm talking about when you would sign for the handbooks?

Page 82

A. Well, to clarify, they would give you a handbook when you get hired.

Q. Okay.

A. Then after that, they stop doing it.

Q. Okay.

A. You would go on the system and do it.

Q. Okay.

A. If you want to refresh your mind.

Q. Gotcha.

And you remember that you knew how to get on the system and look at a policy if you needed to, right?

A. Yes.

Q. Okay. All right. You can set that to the side.

Okay. Let's talk about some of the specific policies. I'm going to hand you this one first.

(Exhibit 6 marked.)

Q. (BY MS. EDWARDS) I'm going to mark this as Exhibit 6.

Do you see at the bottom of that page it's marked page number 2?

A. Yes.

Q. So this is the second page of the handbook.

Page 83

And do you see at the top it says your employment at Trader Joe's?

A. Yes.

Q. Okay. And there are two policies on this one page. The first one, do you see the section that says "diversity and opportunity"?

A. Yes.

Q. And it says: "At Trader Joe's we are committed to providing a 'wow' customer experience every day. This means that we select, place, train, and promote the best qualified crew members based upon relevant factors, such as work quality, attitude, experience, availability, and mobility. Every applicant and crew member has an equal employment opportunity and right to be free from discrimination without regard to non-work-related factors, such as sex, sexual orientation, gender, gender identity, gender expression, race, color, ancestry, national origin, citizenship, military and veteran status, religion, momentarily status, age (over 40), physical or mental disability, genetic information, or medical condition, including pregnancy, childbirth, lactation or the need to express milk, and related medical conditions, or any other consideration made unlawful by applicable federal, state, or local law. Equal employment opportunities

Page 84

will be extended to all persons in all aspects of the employer-employee relationship, including recruitment, hiring, upgrading, training, promotion, compensation, benefits transfer, discipline, layoff, recall, termination, or any other terms, conditions, or privileges of employment."

Did I read that correctly?

A. Yes.

Q. Okay. Did you understand that to be Trader Joe's policy about equal employment opportunity?

A. Yes.

Q. And then in the next section, it says "our employment relationship."

Do you see that?

A. Yes.

Q. And it says: "Your employment with Trader Joe's is at-will."

Did I read that correctly?

A. Yes.

Q. What is -- what is your understanding -- or do you know what "at-will" means?

A. No.

Q. Okay. It says: "This means that both you and the company have the right to terminate your employment at any time with or without notice or cause."



Page 85

Did I read that correctly?

A. Yes.

Q. Does -- does that make sense to you that you knew that you -- you could terminate your employment and leave the company at any time, and, likewise, the company could terminate your employment at any time?

A. Yes.

Q. So -- okay. Did you understand that to be the case?

A. Yes.

Q. Okay. You can put that to the side.

Okay. I'm going to hand you another policy.

(Exhibit 7 marked.)

Q. (BY MS. EDWARDS) Mark this as Exhibit 7.

Look at that one. Do you see at the bottom this one is from page 4 of the handbook?

A. Yes.

Q. And this policy is titled "Crew Member Performance and Conduct."

Do you see that?

A. Yes.

Q. And did you -- do you remember that the company, Trader Joe's, had policies about the way crew members were to conduct themselves in the workplace?

Page 86

A. Yes.

Q. Okay. And did you also understand that there were certain behaviors that the company had said they would not tolerate from their employees?

A. Yes.

Q. Okay. So this policy lists some of those out; is that right?

A. Yes.

Q. So if you look starting in that third paragraph right in front of the bullet points.

Do you see that? Where it starts with "the following list"?

A. Yes.

Q. Okay. It says: "The following list is not intended to be exhaustive but rather to identify some of those behaviors that will not be tolerated by the company."

Did I read that correctly?

A. Yes.

Q. Okay. Then it lists out a bunch of examples. So the first one is: "Falsifying or omitting any information on your employment application or other personnel records."

Did I read that correctly?

A. Yes.

Page 87

Q. And did you understand that to be an example of behavior that the company would not tolerate?

A. Yes.

Q. Okay. Then look down to the sixth bullet point. You see where it says -- so just for example, violation of any company policy or procedure. Do you see that?

A. Yes.

Q. And did you understand that to be an example of a behavior that the company would not tolerate?

A. Yes.

Q. Okay. And then the next one says: "Falsifying a time card or any other company report or record."

Did I read that correctly?

A. Yes.

Q. Okay. So then did you understand that that -- that to be an example of behavior that the company would not tolerate?

A. Yes.

Q. Okay. So -- so you knew from this policy that falsifying or, you know, being untruthful to the company was behavior that the company would not tolerate from their crew members; is that right?

A. Yes.

Q. Okay. You can set that to the side.

Page 88

And did you also understand the company to have a policy against retaliation in the workplace?

A. Not to my knowledge.

Q. Do you know what that means, retaliation?

A. What is happening right now.

Q. Well, how would you define, if you know -- I mean, can you tell me what you -- what retaliation means to you?

A. A sue law.

Q. What's that?

A. Like suing them.

Q. Let's look at this policy, and maybe that'll help us understand what -- how we define that term.

(Exhibit 8 marked.)

Q. (BY MS. EDWARDS) So do you see that document? The box in the middle says "nonretaliation policy"?

A. Yes.

Q. And it says: "Trader Joe's will not tolerate retaliation by management or coworkers against any crew member for reporting or complaining of unlawful discriminatory practices, including harassment; for filing a complaint with a government agency; or for otherwise participating in any proceeding, including an investigation in connection with such a complaint."

Did I read that correctly?

Page 89

A. Yes.

Q. So do you understand that to mean that the company wouldn't retaliate against somebody for making a report internally about unlawful conduct, for example?

A. Yes.

Q. Okay. So does that -- does that make more sense about what retaliation would be and what the company's policy against retaliation was?

A. Yes.

Q. Okay. You can set that to the side as well. Did you understand Trader Joe's to have a leave of absence policy?

A. Yes.

Q. What was your understanding of what that policy was?

A. You can only take like a month off.

Q. Do -- do you recall -- was it your understanding the company would give you time off for certain -- certain needs that crew members might have had --

A. Yes.

Q. -- for various -- various reasons?

A. Yes.

Q. And what in your -- in your memory, what were some of those reasons that the company would allow for

Page 90

time off -- extended time off?

A. A birth of one of your kids. Surgery. I think death. I think -- those are the only ones I can remember.

Q. Okay. Let's look at the -- the policy and talk about some of those things.

(Exhibit 9 marked.)

Q. (BY MS. EDWARDS) So I'm going to hand you what's Exhibit 9. It's kind of a thick one. So do you see at the top that says "leaves of absence"?

A. Yes.

Q. And it -- this policy, if you kind of just flip through it, it goes through the various ways or -- you know, reasons that somebody might need a leave of absence and talks about each of those.

Do you see that?

A. Yes.

Q. Did you ever look at this policy for any reason while you were there?

A. No.

Q. Did you -- you never had any need to?

A. No.

Q. Okay. Turn to, if you will, page 50. Tell me when you're there.

A. I'm there.

Page 91

Q. Do you see this -- that section is titled "family medical leave"?

A. Yes.

Q. Okay. And if you look at -- where it says "reason for leave."

A. Yes.

Q. You see that section?

It says: "To care for a newborn child" -- that's what you were talking about before, where they would give you time off for -- for the birth of one of your children?

A. Yes.

Q. And then it says: "To care for a newly placed adopted or foster child in your home; to care for your child's spouse, qualified same sex domestic partner, or parent who has a serious health condition; or for treatment or incapacity, meaning inability to work due to your own serious health condition."

A. Yes.

Q. You see all four of those?

A. Yes.

Q. And so did you understand that those were all reasons that the company might give somebody extended time off from work?

A. Yes.

Page 92

Q. And so did you understand that it also -- that that included your own health condition that needed -- that required you to have some time off of work?

A. Yes.

Q. Okay. You hesitated. Why is that?

A. Because that was not provided to me.

Q. Okay. What do you mean?

A. The -- I mean, I understand all of this stuff. But what just happened, 2020, it -- this didn't matter.

Q. Okay. So if I'm understanding correctly, what you're telling me is, you knew about this policy, but your position in this case is that the company didn't follow this policy?

A. Yeah. They never provide me, said, do I leave of absence.

Q. Okay. And we'll talk about all that and why you believe that to be the case.

But my question for now is, you understand that this policy was available to someone who needed it; is that right?

A. Yes.

Q. Okay. You can set that to the side, and we'll -- we'll talk about some of the other things in a little bit.

We talked a little bit about your captain



Page 93

Dustin. Do you remember his last name being Fuller?

A. Yeah. I had to get a card.

Q. You had what?

A. A business card to remember his last name.

Q. Okay. How often did you work with him?

A. Not that much.

Q. Did you guys have different schedules?

A. Well, he did.

Q. You -- you mentioned before that you had a regular schedule. Is that right?

A. Yes.

Q. What was that regular schedule?

A. It was 2:00 to 10:00.

Q. On what days of the week?

A. Wednesday through Sunday.

Q. Okay. Did you ever deviate from that schedule, like work different days?

A. No.

Q. Those are just always the days that you worked?

A. Yes.

Q. Okay. And do you remember what Dustin's schedule was?

A. No.

Q. Do you know whether or not he -- he's the one that accepted your transfer from California?

Page 94

A. Yes.

Q. He -- and your understanding was he was the one who accepted that?

A. Yes.

Q. Did you -- you feel like you got along with him?

A. I thought I was.

Q. Okay. So you worked Wednesday to Sunday. Do you remember whether you worked Tuesday, April 28th of 20- -- 2020?

A. I don't remember.

Q. Okay. Tell me generally what your job duties were as a crew member at the Voss store.

A. Same thing. Customer service. Register. Cleaning. You're in charge of a section of the store, make it -- keep it clean, making sure that you got signage for every product. Any price changes, you got to make sure they're done. Order product to put on the shelf. That's pretty much it.

Q. Okay. Show you this.

MS. EDWARDS: Mark this as Exhibit 10.

(Exhibit 10 marked.)

Q. (BY MS. EDWARDS) Do you know what this is, Mr. Ayala?

A. Yeah. That was the daily log.

Page 95

Q. Is this -- tell me -- tell me what this shows on this document.

A. Those are all the people scheduled for the morning crew to the evening to the night crew.

Q. Okay. So if you look at this -- for example, the first document, it says Friday, April 24th, 2020; is that right?

A. Yes.

Q. And then were these all the people scheduled to work that day?

A. Yes.

Q. And then the times that they're -- of their assigned shift?

A. Yes.

Q. So, for example, Dustin Fuller scheduled to work from 8:00 a.m. to 6:00 p.m. Is that right?

A. Yes.

Q. Okay. And then if you go to your name, do you see your name on there?

A. Yes.

Q. And that -- your schedule was from -- like you said, from 2:00 to 10:00; is that right?

A. Yes.

Q. Okay. And then what are the initials by your name? What -- what did that mean?

Page 96

A. Those are the -- I guess one of the mates' initials.

Q. Okay. And what -- did that mean you showed up to work?

A. No. That's when they're doing the wellness check.

Q. Okay. So after they do the wellness check, then they initial this right here?

A. They did.

Q. They would put their name on that. Did you actually see them do that?

A. No.

Q. Okay. But that's your understanding is that after doing the wellness check, they would initial --

A. Yes.

Q. -- by the crew member's name? Okay. And then if you go to the -- you know, the colored boxes and -- and all that, can you tell me what -- what those mean?

A. They will give you freedom to do your -- your day schedules, to make it fairly for every crew member.

Q. Okay.

A. That would be from register, sale floor time. That's pretty much it.

Q. Okay. So can you tell me what the different

Page 97

colors mean?

A. The yellow I think that was register time.

Q. Okay.

A. The blue is supposed to be floor time.

Q. Okay.

A. And then the L is their lunch.

Q. What about white?

A. The what?

Q. The white boxes.

A. The white boxes?

Q. Uh-huh.

A. That's when somebody calls out. They cross them out.

Q. Okay. But see how some of them -- like I'm looking at your name, right?

A. Yes.

Q. For this day, Friday the 24th, there's a yellow Y, and then there's a white B.

A. Oh, that's referring to blue -- the blue Sharpie.

Q. Okay. So it means blue. It's just nobody colored it in.

A. Yeah.

Q. Okay. And then -- so you would do -- you did register, floor, then lunch for an hour, then floor

Page 98

again, then register, then floor for the last two hours?

A. Yes.

Q. Okay. And were the last two hours, was the store closed then?

A. No.

Q. What time -- do you remember what time the store closed?

A. 9:00.

Q. Okay. So you -- you would have an hour after closing to clean up or restock or whatever?

A. Yes.

Q. Okay. All right. So just looking on the next few pages, so the next one, Saturday the 25th, your name is on there and you worked that day; is that right?

A. Yes.

Q. And then we have Sunday the 26th. And your name is on there, and you worked that day, right?

A. Yes.

Q. Okay. And then Wednesday the 29th, your name is on there, and you worked that day?

A. Yes.

Q. And then somebody initialled by your name on that day, right?

A. Yes.

Q. And who -- whose initials are those? Do you

Page 99

know?

A. I'm not sure.

Q. Was that -- would that be Jose Castillo?

A. No. There was no Jose Castillo.

Q. You don't remember a Jose Castillo?

A. No.

Q. Do you remember another Jose?

A. No.

Q. Okay. So there's no Wednesday the 28th on here. So does that -- you probably didn't work that day?

A. Say what again?

Q. Wednesday the 28th -- I'm sorry.

Tuesday the 28th. You wouldn't have worked that day, right?

A. No.

Q. Okay. And then if you go to Thursday the 30th, your name is on here, and you worked that day, right?

A. Yes.

Q. And there's initials by your name on that day, right?

A. Yes.

Q. Do you know whose initials those are?

A. Not really.

Q. Okay. If you look, starting at about the 5:00

Page 100

o'clock hour, there's cross-outs through your name?

A. Yes.

Q. Do you know why that would be?

A. I requested to leave early.

Q. Okay. So you were assigned to those different areas, but you didn't actually work them. So somebody crossed through it?

A. Yes.

Q. Okay. All right. So going back to Wednesday the 29th, do you remember who asked you the wellness check questions that day?

A. It had to be George.

Q. Okay. So is it George Castillo?

A. Yes.

Q. I say Jorge, but --

A. No. You said Jose.

Q. I said Jose. Okay. Well, I'm sorry. So you called him George?

A. Yes.

Q. Spelled like Jorge, but it's -- but you called him --

A. Everybody called him George.

Q. Okay. So you think it was probably him that asked you the wellness check questions that day?

A. Well, he was the one closing. He's supposed to



Page 101

ask. But as you show in, someone else will ask you. But --

Q. Okay.

A. -- they will not put their initials.

Q. Okay. Is -- are those -- do you think those are Jorge's initials by your name on that day?

A. Yes.

Q. But you -- you can't recall specifically who it was that asked you the questions that day; is that right?

A. I know he did one time.

Q. Do you know -- I mean, I guess my question is, do you remember specifically who asked you the wellness check questions that day, Wednesday, April the 29th?

A. It was him.

Q. Okay. And -- and then the next day, the 30th, do you remember who asked you the questions that day?

A. No. I don't remember.

Q. Do you remember if it would have been Dawn Langdon?

A. It seems like her signature -- her initials.

Q. It does or doesn't?

A. It does.

Q. Okay. So do you think maybe that was her who asked you?

Page 102

A. Yes.

Q. Okay. Do you remember what the questions were?

A. Yes.

Q. Okay. What's the -- first, before I ask you that, do -- was your recollection about when Trader Joe's started asking you all those wellness check questions? At what point?

A. Can you repeat that again?

Q. At what point do you remember Trader Joe's ask -- started to ask those wellness questions at the beginning of every shift?

A. Like an hour later that you were -- you clocked in.

Q. Okay. Let me clarify the question. They didn't -- you worked for Trader Joe's for a long time --

A. Yes.

Q. -- before coming to Houston, and even -- and then -- and then started working in Houston in 2019, right?

A. Uh-huh. Yes.

Q. These wellness questions that they asked you, that wasn't something that always had -- had happened since the beginning that you worked for Trader Joe's; is that right?

A. No.

Page 103

Q. They started it at some point later, right?

A. Yes.

Q. And what is your understanding or memory about why they started asking these wellness check questions?

A. Because of COVID.

Q. Okay. So they started asking the wellness check questions to help protect against somebody unknowingly coming into the workplace with a case of COVID?

A. Yes.

Q. Okay. Do you remember about when that process started that they -- that they implemented this new process of asking everybody the wellness check questions?

A. That should be like mid April.

Q. Mid April you think?

A. Uh-huh.

Q. Is that a "yes"?

A. Yes.

Q. Sometime -- you mean -- do you recall the COVID pandemic kind of hit the US in this area around mid -- middle of March of 2020? Is that right?

A. Yes.

Q. Something like that?

A. To my -- to my knowledge, yes.

Page 104

Q. So it would have been sometime after that March or April where they started asking these questions?

A. Yes.

Q. Okay. And do -- do you remember offhand when they first started asking the questions what those questions were?

A. They show me one paper just to scan it, like a quit brief to scan. So I didn't pay attention to it.

Q. Uh-huh.

A. Then everybody was talking about the symptoms. So we were just focused on the symptoms. That's how it went.

(Exhibit 11 marked.)

Q. (BY MS. EDWARDS) Okay. Let me show you this document. I'm marking this as Exhibit 11.

Take a look at that. Tell me if you recognize this to be the list of questions that the company asked you for the wellness check.

A. For the symptoms, yes.

Q. Okay. And so the questions were, first, are you experiencing any of these symptoms? Right?

A. Yes.

Q. Fever, cough, shortness of breath, sore throat, diarrhea, lack of sense of smell or taste; is that right?



Page 105

A. Yes.

Q. And then two, do you live with anyone who has tested positive for COVID-19 in the past 14 days or who is currently awaiting results for COVID-19?

A. Yes.

Q. Is that right?

And then three, are you awaiting -- are you awaiting results for a COVID-19 test; is that right?

A. Yes.

Q. And so these were the questions that were part of the wellness check?

A. Yes.

Q. Okay. And the -- the mate or the captain, whoever it was, would ask you these questions at the beginning of your shift?

A. Yes. Symptoms. Not the questions.

Q. Okay. So you remember that they would ask you about the symptoms?

A. Yes.

Q. But you don't remember questions 2 or 3 being asked?

A. No.

Q. Okay. Ever --

A. No.

Q. -- or just at the beginning?

Page 106

A. Like I said, they just give me the paper, looked through it. I give it back.

Q. Okay. So they -- they wouldn't actually ask you the questions out loud. Is that what you're saying?

A. No.

Q. They would hand you -- did it -- was it this exact paper or something different?

A. They don't give you anything.

Q. Okay. I thought you said they gave you a paper with the questions on it.

A. When they first send it out to the whole regions, that means California, everywhere Trader Joe's is located, they send an e-mail to every store. They showed us the paper. So they would give it to me. I would kind of look at it. Give it back to him, the mate. Give it to the next person. The next person. Next person.

Q. Okay.

A. And --

Q. Would pass it around?

A. Pass it around, say if me and three other people, and then we give it back. We go on with ourself to work. And then the following week, when I come back from my days off, they'd be like, oh, you remember that paper? I was like, what paper? About the symptoms.

Page 107

Like, yes. Okay. We're going to start doing that now.

Q. Okay.

A. All that. Okay.

Q. Okay.

A. And they would only ask you the symptoms.

Q. Okay. So tell me about, you know, the end of April when you were going in to the store to do work. Tell me about the process of the wellness check, how that would occur.

A. Well, first was we're supposed to use mask.

Q. Okay.

A. That's the business I was -- you know, done, like we close the store. We would like take them off. A week later, they say, you need to have the mask on as soon as you get off on your vehicle into the building, the mask had to be on, even though the store could be close, business hours is close. You got to have it on, keep your distance. We all do the same thing.

They say, if you're on register, wipe down the register any chance you have between customers. Sanitize anything you touch or the customer touch. So there was back-to-back registers. So one register in between was empty.

Q. Okay.

A. So we had like probably nine -- I think nine

Page 108

registers or eight registers. So probably like six were open or less.

Q. Okay.

A. So every time I was on a register, I would wipe it down every time I got a chance. Someone -- another crew member would help me bag, but that person would be on the other end of the register. The customer in front of me. But with a distance. And that's what we did. And that was -- I was doing what I was told.

Q. Okay. Okay. But in terms of the wellness check, when you would come into the beginning of the shift, tell me about that process where the mate or the captain, whomever it was, would -- would screen the crew members coming in for COVID symptoms.

A. Well, it would be entity not the closing -- mate. They would approach you saying, how are you doing? I see you're clocking in or about to clock in. And you going to ask, I'm okay.

But the thing is, they looked at you like, oh, that's not what I was asking. So I was like, you got to be more clear on what you're asking. They were like, you got symptoms. I was like, oh. So one time it was me and three other people too clocking in. And they just say, hey, how you're doing? All three of us, we like, oh, we're fine. Oh, no, no. That's not what I

Page 109

meant. Okay. So what are you talking about? And they was like, oh, your symptoms. Well, I'm fine. I feel a hundred percent. They're like -- then this person will ask, you got cough? No. I'm fine.

And then we clock in. I would like fill out my daily log. My first hour, sometimes I would like be on the floor because I got to write my order in for my section. Check my back stock. And then later on the mate who is in charge that night will come around for each individual working, asking them verbally just the symptoms.

Q. Okay. Did the process ever change?

A. After I left?

Q. No. Before you -- before you left. I mean, did it --

A. No.

Q. Obviously, the -- with the COVID situation, things were changing. You mentioned, for example, that the mask policy kept changing.

A. No. That's stated -- we had got it -- had it on all the time.

Q. Okay. So did the process of them asking you the screening questions, the wellness check questions, did that change periodically?

A. No. Every mate would ask you just the symptom

Page 110

verbally.

Q. Do -- do you remember working -- we looked at the schedule. So you worked on Thursday, April 30th of 2020?

A. Uh-huh.

Q. Is that a "yes"?

A. Thursday? Yes.

Q. Okay. Do you remember anything in particular happening -- happening of note on that day?

A. No. It was a regular day.

Q. Do you remember who the mate was on that shift?

A. I'm not sure. It was either George or Jerry the ones closing. I'm not -- cannot remember.

Q. Okay. And do you remember we looked at the schedule, and you said you thought it might have been Dawn's initials by your name?

A. She was there, but I'm not -- I cannot recall if she was the one closing, because the thing is, with them, their schedule is one of them goes on vacation, everyone else got to overlap each other's schedule. So you constantly would not see that same mate three days out of the week. But as their schedule changes, you might see them.

Q. Uh-huh.

A. But then you would be asking yourself why

Page 111

they're here, or sometimes you don't ask questions. You just report to whoever's in charge and you go do your -- your job.

Q. Okay.

MS. EDWARDS: Objection to the nonresponsive portion.

Q. (BY MS. EDWARDS) Do you remember Dawn Langdon asking you the wellness check questions on April 30th; Thursday, April 30th of 2020?

A. No.

Q. Do you remember anyone else asking you those questions on Thursday, April 20th -- April 30th, 2020?

A. I think it was Jorge.

Q. Okay. What do you think Jorge asked you on that day?

A. Well, I signed the daily schedule and another paper. And he had holding it in front of them --

(Ms. Cahan left the proceedings.)

THE REPORTER: Somebody just left.

MS. EDWARDS: Okay. Thanks.

THE WITNESS: And he only asked me for the symptoms.

Q. (BY MS. EDWARDS) Okay. Do you recall specifically what was exchanged between the two of you, or is that just the best of your recollection?

Page 112

A. He just asked me, hey, how you doing? I replied, I'm okay. And there was another person next to me. So we both say we're okay. And he's like, that's not what I meant. We were like, okay. So he's like, you know the routine now. You know the wellness check, your symptoms. We're like, oh, okay.

And I told him, I feel fine. I'm a hundred percent fine. And I was writing my order that day; so I just keep doing my thing.

Q. Okay. Who were the other people around you that would have heard that exchange, the other crew members?

A. His name is Simpson.

Q. His name is what?

A. Simpson.

Q. Simpson?

A. Yes.

Q. Anybody else?

A. No. I don't recall no one else. Probably there were more crew members around, but I don't recall.

Q. And then do you remember later that day reading and signing an updated policy about COVID-19?

A. Well, basically, it's like not an updated. It was something that said to refresh our minds again. Basically, what we were doing, sanitizing, cleaning our

Page 113

hands every 20 minutes or so. The -- the 6 feet distance. That is pretty much what it was, and that's basically what we were, like, doing until I saw this. And I took the time to read it, and I noticed those questions.

Q. Uh-huh. Okay. You noticed which questions?

A. The three questions on the bottom of the wellness check.

Q. You saw that on the updated policy. Is that what you're saying?

A. I guess we can call it dated. It was just a refreshing your memory or something.

Q. Okay. And you say you saw the questions on there?

A. Yes.

Q. And then what did you do after seeing that?

A. So what I was told was to go in the office. They had these supposedly new guidance -- basically not the new guidance, but basically what we were told to do. And acknowledge what you were reading and sign it at the end. So I acknowledge everything, all the information they gave me, like not gave me but showed me.

And I noticed this. So to my knowledge, to my understanding is I acknowledge everything I had so I had to sign it. So I signed the paper saying I

Page 114

acknowledge everything I saw. But once I saw this, I was like, I guess I'm not supposed to be here. So I didn't say nothing to Dawn.

I went to the register. Call another person over. I was like, hey, they have some information over there that you need to acknowledge. And they were like, oh, okay. I was on the register for five minutes, and then my conscious kicked in. I saw Dustin, and I approached him. I didn't touch him or nothing. I approached him with distance, and I told him that I need to talk to you about something. And that's what I told him.

Q. And what did you tell him?

A. That I took a COVID test, and I didn't have no knowledge that I'm not supposed to be in the store.

Q. Okay. When -- when had you taken the COVID test?

A. That was on my weekend.

Q. Do you remember the date?

A. I think it was Monday.

Q. Okay. And then what did Dustin say in response to that information?

A. All of a sudden he got kind of upset because he had the mask on and said, you already knew this. And I was, like, what are you talking about? And he said, you

Page 115

need -- you need to leave and -- and then I was telling him I'm sorry. I didn't have no idea. It's like, don't worry about it. Just go home. So I didn't get a chance to clean my locker or nothing. Just grabbed my jacket and I left.

Q. Okay. And what was your understanding of why you had to go home?

A. When it says here, if you're taking -- you've been around somebody or you had a test or waiting for the result.

Q. Okay. And you had had a test and were waiting for the results; is that right?

A. Yes.

Q. And you also were living with somebody who was awaiting the test results; is that right?

A. Yes.

Q. Tell me why you took a test in the first place.

A. To be safe to say that hopefully I didn't have it.

Q. Did you have a reason to believe you had been exposed at that -- at that time?

A. Not really.

Q. You just decided --

A. No.

Q. -- to go take a test?

Page 116

A. Yes.

Q. For no -- just -- just to be --

A. Safe.

Q. -- extra cautious?

A. Yes.

Q. Where did you go to take the test?

A. Here in Harris County.

Q. In Harris County?

A. Yes.

Q. Where -- what -- where -- what specific location?

A. I know it was somewhere Sugar Land, but I'm not sure exactly where.

Q. Okay. Some -- somewhere in Sugar Land?

A. Yes.

Q. Okay. And your -- to your knowledge, you hadn't been exposed to anybody who that COVID?

A. No.

Q. You just went and took a test just because?

A. Yes.

Q. And you and your wife both went and took it?

A. Yes.

Q. Did you eventually test positive?

A. Yes.

Q. What about your wife? Did she test positive?



Page 117

A. Yes.

(Exhibit 12 marked.)

Q. (BY MS. EDWARDS)  Handing you what I'm marking Exhibit 12.  Take a look at that, please.  Is -- can you tell me whether this is the document that you reviewed on that Thursday that you had to sign?

A. It looks like it.  It's still missing the -- the other page.

MS. POTTINGER:  What page are you talking about?

THE WITNESS:  The symptoms.

Q. (BY MS. EDWARDS)  Okay.  So that's what I was going to ask you.  You don't see the page in here with the -- with the questions?

A. No.

Q. Okay.  So that -- that's not anywhere in here, right?

A. Doesn't look like it.  Because I see symptoms here, but this is -- this is the new symptom up -- update.  It changed from that to this.

Q. Okay.  Is this -- do you see your signature at the back of this document?

A. Yes.

Q. Okay.  All right.  So to the best of your recollection, is that that document that you were

Page 118

referring to that you looked at on that Thursday?

A. Yes.

Q. And that's what made you realize that you needed to tell somebody that you were currently awaiting the results of a test?

A. Yes.

Q. Okay.  Did anybody contact you from Trader Joe's after you were sent home on that Thursday?

A. Yes.

Q. Who contacted you?

A. Dustin Fuller.

Q. And what did he -- what did he say to you?

First of all, how did he contact you?

A. He pull up my phone number off the -- the daily [sic] force.

Q. Okay.  So he called you, or did he text you?

A. He called me.

Q. And what did he tell you?

A. Not to worry about it.  They will have a cleanup crew.  Everything is going to be okay.  And I kept replying, I'm sorry that I have no knowledge.  And he said, but you knew this.  I was like, no.  I didn't.

Q. Okay.  What -- what else did -- did you guys talk about?

A. He said that supposedly the region manager

Page 119

supposed to get in contact with me, or somebody from the HR is supposed to get in contact with me.  That never happened.

Q. So you remember this being a phone call, not -- with Dustin; is that right?

A. It was a phone call.

Q. Did you also have a text exchange with him that day?

A. After, yeah, it was.

Q. After the phone call?

A. Uh-huh.

Q. Is that a "yes"?

A. Yes.

Q. Okay.  What -- tell me about the text exchange.  What do you remember about that?

A. He would just trying to check on me, see if I got the results already.  But the day he text me, I went to sleep.  And his text message wake me up, and I replied to him saying, no, I don't think we have the results yet.

But then I talked to my wife about it, and she said, oh, yeah they called.  They give us the result.  We're positive.  So I thought, oh, okay.

So I text Dustin back and tell him, like, well, I just heard that we got the results, and it's

Page 120

coming back as positive.  And then he's like, okay.  Something like, let me see what I can do, something like that.  And he said probably the region manager might want -- want me probably to write -- what do you call it -- testimony I think.  And I was, okay.  And then he -- I asked him like, how am I going to send to her because I didn't have no information about her.  And he asked me to send it to him.  To his e-mail.

Q. Okay.

A. So that's what I did.  And after, I guess, we keep on texting.  And then later, couple days later, he -- I think it was the following week.  He called me saying something about an e-mail that got sent to him that, unfortunately, they have to let me go; that I got to be terminated.

So at first I was like, but how?  Why?  And he's like, well, we're going to send your last paycheck, your -- all your AR -- that's the -- your time earnings.  They're going to send them to me.  And I guess they send me kind of like a termination write-up paper.  And pretty much that was it.

MS. EDWARDS:  Okay.  Let's just go ahead and take a break, if that's okay.

THE VIDEOGRAPHER:  1:28.  We're off the record.



Page 121

(Break taken from 1:28 p.m. to 1:45 p.m.)

THE VIDEOGRAPHER: All right. It's 1:45. We're back on record.

Q. (BY MS. EDWARDS) Sir, we're back on the record after a break. Do you understand you're still under oath?

A. Yes.

Q. Okay. Before the break we were talking about what happened on Thursday, April 30th and thereafter. And so I just want to summarize that. You say you -- you went to work that day, and you do remember someone -- you think it might have been George asking you about your symptoms is; that right?

A. Yes.

Q. And -- but you don't remember the other questions being asked?

A. No.

Q. Is that right?

Okay. But then you were reviewing the -- the COVID-19 infection prevention safety notebook, and it reminded you of some of the various requirements; is that right?

A. Yes.

Q. And that's what we have marked as Exhibit 12; is that right?

Page 122

A. Yes.

Q. And you signed your name at the back of that acknowledging your -- that you received and reviewed those materials; is that right?

A. Yes.

Q. And you say it was when you reviewed those materials that you were reminded about the other -- the additional questions about whether or not you were awaiting a test result; is that right?

A. Yes.

Q. And so you decided, after kind of thinking about it, that you said your conscious took over you, and you approached Dustin Fuller about the fact that you had taken a COVID test and you were awaiting the results; is that right?

A. Yes.

Q. And he sent you home because of that; is that right?

A. Yes.

Q. At that time, did -- did Dustin tell you that you should have told him about the fact that you were awaiting a test result?

A. As we're walking, yes, he asked me to -- I should have told him as I walked in.

Q. Uh-huh.

Page 123

A. But I was not thinking about it, not worrying about it. Seeing all the commotion in the Internet, social media, people were skeptical about it. To me it was like a normal day, and I get home safely to my kids and my wife.

Q. You said people were skeptical about it? Is that what you're saying?

A. Yes.

Q. What are you saying people were skeptical about?

A. Like wearing the masks, or seeing people were kind of crazy masks that were used or coverings.

Q. Uh-huh.

A. So people -- some crew members got scared. It's -- I don't know. Some -- I was started not seeing them anymore.

Q. Are you saying people were skeptical about whether or not COVID was serious? Is that what you're saying?

A. Not too series or too serious. It depends how people were taking it.

Q. What was your personal opinion about it at the time?

A. At first it was like probably it's not too serious. They were fine. Not care.

Page 124

Q. Uh-huh.

A. You know, something.

Q. Yeah.

A. Because we were just -- not everybody would talk about it, but we would like just -- you know, distance. You never know who comes to your house.

Q. Did it seem like an inconvenience to you at the time to have to go through all those procedures and protocols?

A. In one way, yes. And another one is like I guess we got to be safe. You never know.

Q. Yeah. And you took a test to try and be safe.

A. Yes.

Q. Is that right?

And as it turned out, you were positive.

A. Yes.

Q. Right?

Okay. So then you went home, and you said Dustin contacted you the next day, on Friday May 1st; is that right?

A. Yes.

Q. And you say you had a phone call with him initially?

A. Yes.

Q. And summarize again for us what he told you on



Page 125

that phone call?

A. If I had my results back. And I was just waking up from a nap, and I said no. But probably 20 minutes after, I talk to my wife. She said, yes, we did get the results back. And right away I talked to him. I called the store.

Q. What else did Dustin tell you during that phone call?

A. He told me to take 14 days, not to worry about it. Everything is going to be okay. They're going to try to get like a cleaning crew to disinfect the whole store, I guess. And that was pretty much it.

Q. Okay. And so he -- he told you to take the 14 days of leave that was -- that Trader Joe's was providing --

A. Yes.

Q. -- for COVID-related leave; is that right?

A. Yes.

Q. What was your understanding about that leave that was being offered to crew members?

A. Well, I was going to get paid, you know. That was like, you know, thinking positive. Saying, like, everything's going to be okay. We're going to make it. We don't we have our jobs. And didn't happen like that.

Q. Okay.

Page 126

MS. EDWARDS: Objection; nonresponsive.

Q. (BY MS. EDWARDS) What I want to know is, can you tell me what that 14-day leave benefit was that Trader Joe's had -- had provided? What was your understanding of what was offered to crew members if they needed time off for COVID-related reasons?

A. Well, it was just -- you request it, and they would just pay you for the 14 days.

Q. Okay. So what was your understanding of how -- under what circumstances could you take that 14-day leave?

A. If you have the symptoms or anxiety or something...

Q. Or what? What did you say?

A. Anxiety.

Q. Anxiety?

A. Yes.

Q. Okay. So if you were -- if you had COVID, right, then you could take up to 14 days off of work --

A. Yes.

Q. -- to recover from that?

A. Yes.

Q. And then, you know, or -- were there other reasons that you could take leave? Like if you needed to care for a child who had it or something like that?

Page 127

A. I think so.

Q. Okay. And you were aware of that policy at the time?

A. Yes.

Q. How did the -- how did Trader Joe's communicate that to you?

A. They -- well, basically, was verbally within the store. They say, if you feels, you know, a certain way, you can just take the 14 days.

Q. Okay.

A. They never said you had to proof of a test or nothing like that. So we were just verbally talking.

Q. Okay. Okay. Let me show you an exhibit. 13.

(Exhibit 13 marked.)

Q. (BY MS. EDWARDS) Can you tell me what this is?

A. The texting between me and Dustin.

Q. Okay. And that's the text exchange that was on Friday, May 1st; is that right?

A. Yes.

Q. And he says: "Hey, Jose. It's Dustin. Just wanted to check in on y'all. How's it going?"

Is that right?

A. Yes.

Q. Okay. And you said this is a text message that he sent you after you spoke to him on the phone?

Page 128

A. Yes.

Q. Okay. And then you say -- eventually, you say: "I just got the phone call about results, and, unfortunately, it came back positive."

And then he -- he -- there's a little bit of an exchange, and he says: "Okay. Let me find out what to do next."

A. Yes.

Q. Is that right?

Okay. And then -- and then later he says: "Wish you would have told me you were tested before coming in the store."

A. Yes.

Q. And then you say: "I did not realize I had to do that, and I'm sorry. I thought I was doing the right thing by getting tested and waited on the results before telling you."

A. Yes.

Q. And then he says: "Yeah. It's one of the questions we ask on the wellness check questions."

Is that right? He says that?

A. Yes.

Q. But you don't remember -- you're saying you don't remember those questions?

A. They never ask those questions.



Page 129

Q. And then -- let's see.

Do you see on the next page it looks like he texts you again on May the 4th. Is that right?

A. Yes.

Q. And he says: "Liz wanted me to ask you to write down a statement about the wellness checks on Thursday when you told me you've been tested."

A. Yes.

Q. Okay. And then -- so then did you do that statement? Did you write that down?

A. Yes.

Q. And did you send it back to Dustin?

A. Yes. See that e-mail. Yes, here.

(Exhibit 14 marked.)

Q. (BY MS. EDWARDS) Okay. I'm going to hand you Exhibit 14. Is this the statement that you wrote up to send to Dustin?

A. The bottom part, yes.

Q. Okay. So can you read that for us what you're -- can you read your statement for us?

A. "On April 30, 2020, I met with my captain, Dustin Fuller, and" --

THE REPORTER: Can you speak up?

THE WITNESS: From the beginning?

THE REPORTER: Just speak up for me.

Page 130

THE WITNESS: "I met with my captain, Dustin Fuller. He provide new guidelines with de" -- "details" -- "details, symptoms, and expectation during COVID-19 pandemic. I recall the following symptoms list fever, cough, headache, sore throat. All I was -- which I was not experience. However, the last sentences say if an employee had been tested for COVID-19, they are to stay at home while waiting for results. It was at that time that I brought it to my captain attention, and he send me home."

Q. (BY MS. EDWARDS) Okay. Keep going.

A. "On April 27th, 2020, I went to a nearest facility at Smart Financial Centre in Sugar Land. That is where I was tested for a COVID-19 test by swabbing my nose. All they say was to expect a phone call with my test result in the next 3 to 10 days" -- "business days. Today is May 4th, 2020, and I had yet to experience any symptoms. At least" -- "the reason I tested for COVID-19 is because I realize I have" -- "I live with tested positive, and I wanted to make sure I wasn't exposed. I wasn't told before April 30th, 2020, to stay home if I was tested. I was only advised to stay home if I experienced any symptoms. Please e-mail me or call me at (650) 387-2710 if you need any" -- "anything else."

Page 131

Q. Okay. Did you write this yourself?

A. Yes.

Q. Did you have any help with it?

A. Some words.

Q. Like what? What part? What parts?

A. The facility name.

Q. Okay. Who helped you with it?

A. My wife.

Q. Did she help write some of this for you?

A. Some words it was hard for me to spell them, but other than that, no.

Q. Did she have to write a similar statement for her job?

A. No.

Q. Okay. She was also sent home, though, right?

A. No.

Q. She wasn't?

A. No.

Q. She worked for Trader Joe's, too, right?

A. Yes.

Q. Okay. And so she would have been -- the same policies applied to her, right?

A. Yes.

Q. So did she have to stay at home since she was awaiting a test result?

Page 132

A. I told her to stay home.

Q. Okay. And so then did she actually do that?

A. Yeah. She stayed home.

Q. Okay. You say in here that you tested -- you say: "The reason I tested for COVID-19 is because a relative I live with tested positive, and I wanted to make sure I wasn't exposed."

Is that right?

A. Yes.

Q. You told me earlier that you just went as a precaution.

A. Yes.

Q. So it's different than what you told me earlier, isn't it?

A. No. To me it's the same thing.

Q. Okay. But earlier when I asked you, you didn't tell me about the relative that you'd been exposed to.

A. You didn't ask me that.

Q. Okay. Is that your testimony?

A. Yes.

Q. Okay. And then did you hear from anybody after you sent this statement?

A. No.

Q. At what point did you hear from Trader Joe's that your employment was being terminated?



Page 133

A. From Dustin.

Q. Okay. At what point?

A. I think it was -- I think it was Monday, like the following week after I got -- I told him that we tested positive.

Q. Okay. And did he call you on the phone?

A. Yes.

Q. What did he say?

A. That on conclusion of basically me kind of like lying -- I can't remember the word -- about the symptoms and the questions, they were deciding to terminate me.

Q. Okay. Say that again.

A. They decided to terminate me.

Q. Okay. Dustin told you that Trader Joe's decided to terminate you based on the answer to the questions?

A. The e-mail that he received from that --

Q. Based on -- based on your e-mail?

A. No. I guess -- I'm not sure if HR or the region manager, something they e-mail to him about termination, because I didn't see that e-mail. He did. And he was just reading off of that.

Q. So he just read you an e-mail?

A. Yes.

Q. Is that right?

Page 134

(Exhibit 15 marked.)

Q. (BY MS. EDWARDS) Let me hand you this document, Exhibit 15.

MS. EDWARDS: What time is it?

MS. POTTINGER: Yes? Yes? Uh-huh. Yes, ma'am.

THE REPORTER: We're on the record.

MS. POTTINGER: I thought I did. Okay. I will do that. Thank you. Uh-huh. Bye-bye.

Doctor's office. So sorry. Go ahead.

Q. (BY MS. EDWARDS) Okay. Is this -- do -- did you ever see this document, Mr. Ayala?

A. It was in the mail for me.

Q. Okay. Is this the document that you based on what Mr. Fuller was telling you over the phone? Do you think this is the document he was reading from?

A. I'm not sure.

Q. Okay. Let's look at what it says. I'm looking at the second paragraph under "termination."

It says: "On April 30th, 2020, you informed us that you were awaiting test results for COVID-19. You worked on April 29th, 2020, and April 30th, 2020, while waiting for the test results. When asked the wellness check questions on both dates, you applied no to the question: Are you awaiting results

Page 135

for a COVID-19 test? When you came forward to on April 30th, you admitted to answering no when you should have answered yes. Because of this, you needlessly and recklessly put your fellow crew members and customers' health at risk. Also, your" -- "your untruthful behavior shows a lack of integrity. Your employment with Trader Joe's is terminated effective immediately."

Did I read that correctly?

A. Yes.

Q. Okay. Is this what Mr. Fuller told you over the phone when you spoke?

A. Yes.

Q. Okay. And then you later received this in the mail; is that right?

A. Yes.

Q. Okay. Then you sent -- after that conversation with Mr. Fuller, you sent an e-mail back to HR asking about your termination; is that right?

A. I asked them, yes, about the termination and the wellness checklist.

Q. Okay. Go back, if you will, to exhibit -- I think it was 14, the one right before with your e-mails, your statement.

You see that?

A. Yes.

Page 136

Q. Okay. Look at the e-mail at the top of the page. It says: "I was just advised by my captain, Dustin Fuller, that I was fired for testing positive for COVID-19."

Is that what he told you?

A. Yes.

Q. Did he tell you that you were fired for testing positive for COVID-19 or fired for not answering the questions accurately?

A. Well, that's my thought.

Q. Okay. So he didn't actually say that, but that's what you were -- that's the way you took it?

A. Yes.

Q. And then you say: "I don't understand why this is, because I was never told about being tested and staying home while waiting for results until April 30th, 2020. The statement below was requested from me, which I sent to Dustin last night. And now today I am terminated. Never once between this period did I hear from HR or the regional concerning this matter about my work status. Can you please the advise the reasoning behind this termination? I would greatly appreciate your responses."

Did I read that correctly?

A. Yes.



Page 137

Q. Did you write this e-mail, sir?

A. I got help.

Q. You had help from your wife with this one as well?

A. Yes.

Q. Okay. Did anyone respond to this?

A. The lady that's charge -- HR lady. I don't remember her name. I think it's the area -- they change --

Q. Let me mark this as 16.

(Exhibit 16 marked.)

Q. (BY MS. EDWARDS) That one.

Okay. If you turn to -- let's see. Go to the second-to-last page. And do you see at the top of that page, that's the e-mail that we just went over; is that right?

A. Yes.

Q. Okay. So turn to the page before that, and let's look at the response.

A. Which --

Q. Yeah. The one right before that, because, you know, it's going in reverse order, right, with an e-mail?

So do you see where it says -- so it's Diane Carroll who represented to your e-mail, right?

Page 138

MS. POTTINGER: Is this on May 5th?

MS. EDWARDS: Yes. The one on --

MS. POTTINGER: Okay.

MS. EDWARDS: -- May 5th, 2020, at 4:01 p.m.

THE WITNESS: Okay.

Q. (BY MS. EDWARDS) Do you see that?

A. Yes.

Q. And do you see it's Diane Carroll who responded to your e-mail?

A. Yes.

Q. Okay. She says: "Jose, your e-mail that you sent Maricel and copied Ariel should have been addressed to me as I'm your HR generalist for your region."

And she goes on to say: "The reason you were terminated is because you did not respond in a truthful way when you were asked the questions during a wellness check."

Did I read that correctly?

A. Yes.

Q. And then look at the very last sentence of that e-mail. She says: "You were not terminated because you tested positive. You were terminated because you didn't tell the truth, and that put your coworkers and customers at risk."

Page 139

Did I read that correctly?

A. Yes.

Q. Okay. So Diane Carroll responded and said -- clarified that you weren't tested -- you weren't terminated for testing positive; you were terminated for the way you answered the questions. Is that what she related to you?

A. Yes.

Q. Okay. And then did you respond to her e-mail?

A. I think I did.

Q. Remember, they go in reverse order. So if you look at the page before. Or -- yeah. Actually, it starts at the bottom of the second page where you respond to her.

A. On May 5th?

Q. Uh-huh. You see that?

A. This one here with the blue?

Q. The very bottom where it's an e-mail from you to Diane Carroll. May 5th, 2020, at 2:22 p.m.

Do you see that?

If I may. Here.

A. Oh, this one right here?

Q. Yeah. Right there. Do you see that where you respond to her?

A. Yeah.

Page 140

Q. Okay. And then can you read what you wrote back to her?

A. Hello, Diane, can you please specify what question I did not respond in a truthful manner? What form are you speaking about? I have yet not" -- "yet to experience any symptoms that were asked by Dustin or any mate, and I have been following all the guidance told to me. I wore my" -- "I wear my mask at all times, wash my hands, sanitize my area after every single customer that went by at the register. I was never specif-" -- "specifically calling, asking if I had been tested for COVID-19. I feel like I" -- "I am being wrongfully terminated. This is not nothing" -- "something that I wasn't expecting to have encounter" -- "encountered and now I am being let go."

Q. Okay. Did you write this yourself?

A. Yes.

Q. Did you have help again from your wife with this one?

A. Yes.

Q. Okay.

A. With the spelling.

Q. Okay. And you say in here, you say -- you say: "I was never specifically asked if I had been tested for COVID-19."

Page 141

Is that right?

A. Yes.

Q. So that's really the disagreement here is that they say you were asked, and you said no. And you say that you weren't asked at all. Is that right? Would you agree that that's sort of the bottom-line disagreement?

A. Well, I wasn't never asked if I was tested --

Q. Yeah. But you understand that Trader Joe's says that you were asked, and you said no?

A. They never asked me that.

Q. I understand that's your position, sir. But do you understand the company's position is that you were asked and you said no?

A. Yes.

Q. Okay. So you understand that is really the disagreement here?

A. Yes.

Q. Okay. You can set that to the side.

MS. EDWARDS: And I think we probably need to take our break now. Right? Okay.

THE VIDEOGRAPHER: It's 2:13. Off the record.

(Break taken from 2:13 p.m. to 3:09 p.m.)

THE VIDEOGRAPHER: All right. It's 3:08.

Page 142

We're back on record.

Q. (BY MS. EDWARDS) All right. We're back on the record after a -- I guess -- you want to call it a lunch break. Do you understand you're still under oath, sir?

A. Yes.

Q. Okay. Is there anything from your testimony from before the break that you want to go back and clarify or change?

A. No.

Q. Okay. Just -- just for the record, during your employment at -- at Trader Joe's, did you ever submit a request for FMLA leave or extended -- extended time off for medical leave?

A. Yes.

Q. You did?

A. Extend it? No.

Q. No -- did -- did you ever -- did you ever request a leave of absence during your employment other than what we talked about before with the immigration issues?

A. No.

Q. And did you ever put in a request for -- for medical time off related to your COVID diagnosis?

A. No.

Q. Okay. And your -- your girlfriend that -- your

Page 143

wife -- I guess you're common law married -- she also worked at Trader Joe's during the time that you did in Houston; is that right?

A. Yes.

Q. And she still works there?

A. Yes.

Q. Okay. And she -- just like you, she also took a COVID test on April 27th --

A. Yes.

Q. -- 2020; is that right?

A. Yes.

Q. Did -- to your knowledge, did she inform her supervisors that she had taken a COVID-19 test?

A. Yes.

Q. Did she tell them that -- do you know when she informed them that she'd taken a COVID-19 --

A. When I got sent home.

Q. I'm sorry. Say that again.

A. When I got sent home.

Q. On the day that you got sent home?

A. Uh-huh. Yes.

Q. Was it after you got sent home?

A. Yes.

Q. Did she also -- to your knowledge, did she tell them that she tested positive for COVID-19?

Page 144

A. Yes.

Q. Do you know when she told them?

A. That same day.

Q. Okay. The same day that y'all found out?

A. Well, the same day I got sent home.

Q. Well, do you -- my question was about -- because it was a little while later that you found out that you got a positive result, right?

A. So I went home on April 30th they send me home. So that day I told her to get in touch with her captain because she works on a different location to talk to him and tell him what -- what's going on.

Q. Uh-huh. Okay.

A. And she did.

Q. Okay. And then -- but y'all didn't get your test results back until the next day, right?

A. Correct.

Q. So then, to your knowledge, did she tell her captain or someone else that she tested positive?

A. Later she did.

Q. Okay. Do you know when she did?

A. No.

Q. To your knowledge, was she disciplined for testing positive for COVID-19, after telling them that?

A. That's -- that's different. I don't -- I don't

Page 145

know how everything went.

Q. You don't know how it went down with her?

A. No.

Q. Do you -- to your knowledge, was she terminated for testing positive for COVID-19?

A. No.

Q. Mr. Ayala, what's your understanding of the claims -- the legal claims that you're asserting against Trader Joe's in this case? Do you know?

A. Well, my own knowledge is my job and, you know, last of pay. That's pretty much...

Q. Okay. Do you know that you're making a claim for interference under the FMLA, the Family Medical Leave Act? Are you aware that you're making that claim in this case?

A. I don't recall that.

Q. Are you aware that you're making a claim that Trader Joe's interfered with your right to take a leave of absence for medical reasons?

A. Yes.

Q. Okay. What is your understanding of what that claim is based on?

A. Well, they never give me a chance of anything. So...

Q. Okay. Do you know what FMLA leave is?

Page 146

A. Family leave of absence, I guess.

Q. Yeah. Do you know -- do you know what that is? Family and medical leave, the Family and Medical Leave Act?

A. Assume it's you have a family member or yourself sick. You take time off, like you request it.

Q. Okay. Did you believe that you were entitled to leave -- to that type of leave from Trader Joe's?

A. Well, at first, that's what I thought Dustin meant for me to do.

Q. When he said take the 14 days?

A. To go home and stay home for the 14 days.

Q. Okay. And -- and do you believe that Trader Joe's interfered with your ability to take that 14 days of leave?

A. Yes.

Q. Okay. How so? How do you believe they interfered with the right to take that leave?

A. I mean, they made a decision without any conclusion or give me the chance.

Q. Is it -- okay. Are you saying your -- you think they interfered with your leave because they didn't allow you to take the full amount of leave?

A. Well, it was not clarified to take the leave or not take the -- or be on the leave. I was just sent

Page 147

home. Couple days later, he's telling me, you're terminated.

Q. Okay.

A. So...

Q. Did you know anybody else or do you know of anybody else who worked at your -- your Trader Joe's store who took that 14 day leave for COVID?

A. No.

Q. Do you know anybody else at your store who took family or medical leave?

A. I'm not aware of nothing like that.

Q. Do you know of anybody else who was awaiting test results for COVID-19 but didn't tell the store about it?

A. Don't know.

Q. Is there anybody else at the -- that worked at your store that you believe was treated better than you were?

A. Can't say. I don't...

Q. Do you believe that you were terminated because you needed the time off for COVID-19?

A. No.

Q. Why do you believe that you were terminated?

A. Because I was getting paid the most, and I come from, I guess, a background of management.

Page 148

Q. Any other reason?

A. No. That's -- that's all.

Q. Okay. So just want to make sure I understand you. You think they wanted to terminate you because you were being paid higher than other people at the store for their -- for the position you held?

A. I believe so.

Q. Okay. Is there any other reason that you believe the company wanted to terminate you?

A. No. Not that I know.

Q. Okay.

MS. EDWARDS: I'm going to mark this as Exhibit 17.

(Exhibit 17 marked.)

Q. (BY MS. EDWARDS) Do you recognize -- you can flip through it. Do you recognize this document?

A. Yes.

Q. Okay. Is this your lawsuit that you filed against Trader Joe's?

A. Yes.

Q. And do you believe this to be an accurate document?

A. Accurate.

Q. Yeah?

A. Yes.

Page 149

Q. Is there anything in here that you believe is inaccurate?

A. No. I don't think so.

Q. Okay. And it includes all of your claims against Trader Joe's?

A. Yes.

Q. And have we talked about all of the claims that you've asserted in this document?

A. Yes.

Q. There was one thing I wanted to ask you about. Let's see.

Okay. Do you see -- can you look at the paragraph that's number 10?

A. On page 2?

Q. Uh-huh. You see that? Where it says -- it says: "On or about March 2nd, 2020, defendant amended its leave of absence to cover COVID-19-related self-isolation and symptoms. In line with the protections afforded by the FFCRA, pursuant to its own policy, employees affected by COVID-19 were eligible for up to 14 paid days off."

Did I read that correctly?

A. Yes.

Q. Do you remember that change in the policy?

A. No.

Page 150

Q. Okay. Do you remember whether or not Trader Joe's issued a new written policy about time off if you needed it under COVID-19?

A. No.

Q. Okay. Okay. You can put that to the side. Have -- are you currently working?

A. Yes.

Q. Where are you working?

A. Walmart.

Q. And where -- what location?

A. It's Katy Mills.

Q. When did you start working for Walmart?

A. A year ago.

Q. Do you remember the date?

A. February 5th, 2021.

Q. Okay. How much are you earning in your new job at Walmart?

A. Well, I had to change my schedule. So $15 an hour.

Q. Okay. And how many hours a week are you working?

A. A full shift. Eight hours a day.

Q. Okay. Four shifts of eight hours?

A. 40.

Q. 40. Okay.

Page 151

And have you always been working 40 hours?

A. Yes.

Q. When you said you changed your shift, what did that -- what does that mean?

A. I went from overnight to evenings.

Q. Okay. And were you paid more overnights?

A. Yes.

Q. How much were you paid in that role?

A. 16.50.

Q. Okay. Because you got like an evening shift differential?

A. Well, at first I started with them in the evening; so it was -- I got to the time they were getting new rates. So I got the 15. A month later -- two months later, they were asking for people that want to change to overnight. And on the process of one-week period, you will get a dollar fif- -- 50 as you were working overnight. And then I switch to over -- to overnight, and I work for 10 months overnight out of the year.

Q. Okay. Okay. And then -- so did you -- was there anywhere else that you worked after leaving Trader Joe's before Walmart?

A. Dollar Tree gave me a chance.

Q. Dollar Tree?

Page 152

A. Dollar Tree.

Q. Was that the first job you had after Trader Joe's?

A. Yes.

Q. And when did you go work for Dollar Tree?

A. That was February -- no. January 21st -- I mean, 2001.

Q. Okay.

A. The beginning of the year, I guess.

Q. I'm sorry. What?

A. That was the beginning of the year.

Q. Okay. So you only worked there for a little while before going to Walmart?

A. Yeah. One month.

Q. Why did you leave Dollar Tree?

A. Walmart was paying more.

Q. How much did you earn at Dollar Tree?

A. 7.35.

Q. Okay. Did you work anywhere before Dollar Tree?

A. No.

Q. Okay. So you -- you were out of -- you were not working at all for about seven months; is that right?

A. Yes.



Page 153

Q. Okay. And during that time, what did you do to look for new work?

A. Before I looked for work, I was getting disemployment.

Q. What?

A. Disemployment.

Q. You were just getting employment?

A. Yeah.

Q. Okay. And -- and how -- for how long did you get unemployment?

A. I think was probably like six months.

Q. Okay. Do you remember the total amount that you received?

A. Out of six months?

Q. Uh-huh. Total.

A. I cannot recall it.

Q. No? Okay.

But you would say the employment records would be the best source of that information; is that right?

A. Yes.

Q. Okay. Okay. And so then what -- what did you do -- before you got the job at Dollar Tree, what did you do to try to find new jobs, to try to find new work?

A. Well, because of the COVID, everything got to

Page 154

be online.

Q. Uh-huh.

A. So any -- any job search, you got to do it online.

Q. Okay. So did you do that, look online?

A. Yes.

Q. How -- how did you look for jobs online?

A. Well, in California, there's a group called manpower, and I thought they had it here, but it's not the same thing. I looked for -- I just type in "jobs," and a lot of agencies popped up. And I went off on those.

Q. Okay.

A. But as you open one, five more will open. So I was not clear which one would take me exactly to the job I wanted or where I'm trying to look for the job for.

Q. Okay. Do -- were there particular like Web sites that you went to to look for jobs?

A. Yeah. There were. But every time I go in to fill their application -- my information for their application, something else will pop up. So I'm not sure who I was dealing so sometimes I would just back away. So I'm not really sure which agencies were in charge. Let's say Whole Foods or Home Depot, Walmart.

Q. Uh-huh.

Page 155

A. Because with Walmart, I applied two different stores.

Q. So did you go directly to the -- for example, did you go directly to the Walmart Web site to apply for jobs?

A. One I did. But it would send me somewhere else.

Q. Okay. So did -- I guess I also want to know what, and I'm trying to ask, I guess, is, did you use Web sites like CareerBuilder or Indeed or, you know, those Web sites --

A. I did use Indeed one time. But it's same thing. Like as soon as I'm filing their application, something else will pop up. So sometimes I would like leave it halfway or not deal with it. I even did my own resume and I'd load it.

Q. So did you make a resume during that time?

A. Yes. Yes. I did.

Q. Do you still have a copy of it?

A. No. On my phone.

Q. Okay. Did you keep any kind of record of all the jobs that you applied for?

A. No.

Q. Okay. How many jobs would you estimate you applied for before you got the job at Dollar Tree?

Page 156

A. Probably about five or six.

Q. Okay. Do you remember where those were?

A. Whole Foods. Walmart. Home Depot. Dollar Tree.

Q. Was there anywhere else that you thought about applying that you didn't?

A. No.

Q. Okay. What types of positions were you looking for when you were applying for jobs?

A. Cashier.

Q. Anything else?

A. No. Just that.

Q. Did you have any interviews before you went to work at Dollar Tree?

A. No.

Q. Did you receive any other job offers?

A. No. Dollar Tree was the first one.

Q. Okay. Tell me the ways that you think you've suffered damage as a result of your termination from Trader Joe's.

A. Well, you come to a new state thinking for a better future and this happens. I mean, it's like you're either go back the state you came from, or you stay here, you know, and hold your head up and just wait for the best.

Page 157

Q. Okay. So how do you think you've -- do you think that you've been harmed as a result of Trader Joe's terminating you?

A. Yeah. It hurt.

Q. How so?

A. I mean, to my age it's not -- that it seems like it's easy to find a job in a new -- a new state. And to start all over is not a good idea, especially when you have kids.

Q. Okay. How else have you been harmed, do you believe?

A. Just financially. I mean, I had to pull my 4- -- 401(k) out.

Q. Any other way?

A. No. That's pretty much.

Q. Do you think you've been damaged emotionally?

A. Yes. But I don't want to show it all the time.

Q. Are you -- are you seeking damages for emotional injuries in this case?

A. Yes. We can say that. Yes.

Q. Okay. How much -- how much money in emotional damages are you asking for?

A. I don't know that number. I mean, just to be fair. That's it.

Q. Are you -- what are your symptoms of emotional

Page 158

damage that you believe you've suffered?

A. Well, just thinking -- thinking for looking of jobs and getting rejected, it's like -- it hurts because, you know, you got your kids. To me my family comes first. I mean, I don't have words to explain how I feel.

Q. Have you had to go to a doctor because of it?

A. No.

Q. Or -- or receive any other kind of treatment or anything like that?

A. No.

Q. Or counseling?

A. No.

Q. Have you ever been to counseling?

A. No.

Q. Are there any other damages you believe you've suffered as a result of your termination from Trader Joe's?

A. No. Just the emotional -- you know, losing your job. That's it. Out of what can I do to provide for my -- you know, my family.

Q. Have you -- other than your wife, have you spoken to any current or former Trader Joe's employees about this lawsuit?

A. No.

Page 159

Q. Have you -- have you spoken to anybody else that you've -- that you're expecting to be a witness in this case?

A. No.

Q. Do you have an idea of who you want your witnesses to be in this case?

A. What do you mean?

Q. Like who do you expect to call? Who would testify for you in this case?

A. All I can think of family, but I don't know if that will work.

Q. Are there any other employees or people that you used to work with that you think would be witnesses for you in this case?

A. I mean -- I mean, they can, but they going to ask why and for what.

Q. So you don't have any idea of who you might call to be a witness?

A. Basically I kept it to myself and my family and my wife and -- you know, I have my mom and my sisters back in California. But other than them, no one else.

Q. Okay.

A. No one else knows anything.

Q. Okay. Have we discussed all the evidence you have to support your claims of --

Page 160

A. Yes.

Q. -- against the company --

A. Yes.

Q. -- you think?

Other than what we've talked about today, is there anything that you think that Trader Joe's did to you that was wrong?

A. I mean, I don't think it's Trader Joe's. It's the last person who took the -- the decision.

Q. Who -- who do you believe that to be?

A. Dustin.

Q. So you blame Dustin for it?

A. I don't "blame him" blame him, but I assume he has the last say-so.

Q. And so that's the person that you think did you wrong?

A. Yes.

Q. You -- you believe Dustin was the one that made the decision?

A. That last decision. Yes.

Q. Did -- did Dustin ever do or say anything to you about your having COVID? Like anything negative about it or --

A. We haven't spoken since the last time we text.

Q. Okay. Did he ever say or do anything to you



Page 161

that made you feel like he didn't want you to take time off?

A. I'm not really sure.

Q. Okay. Is there anybody else that you -- at Trader Joe's that you think treated you unfairly?

A. No.

Q. Other than what we talked about, is there anything else that you think Trader Joe's or anybody at Trader Joe's did to you that was unfair or wrong?

A. No.

Q. Okay.

MS. EDWARDS: I'll pass the witness.

MS. POTTINGER: Okay I just have a few questions.

EXAMINATION

BY MS. POTTINGER:

Q. Mr. Ayala, is there anybody who could verify that the only --

MS. POTTINGER: Sorry.

THE VIDEOGRAPHER: I was going to mention it when you were done.

Q. (BY MS. POTTINGER) Is there anybody who can verify that -- and let's go back to the exhibit.

I'd like you to go back to Exhibit No. 11.

Is there anybody that you're aware of that

Page 162

could basically agree with your statement that the only thing they ask you was these symptoms and not the question?

A. Yes.

Q. And who would that be?

A. Laura. Simpson.

Q. Lisa [sic] who?

A. Simpson.

Q. Who -- what's his name again?

A. Simpson.

Q. Simpson.

Okay. Anybody else?

A. No. Only him.

Q. Okay. When you were on unemployment, were you applying for jobs while you were on unemployment?

A. Yes.

Q. Okay. And you turned those in each week? When you would apply to jobs, you would give the unemployment agency the list of jobs that you searched for? Would that be correct?

A. Yes.

Q. Okay. And when trailer -- Trader Joe's sent you home after letting them know you took a test and they terminated you, can you go into more detail as to how that made you feel and how hurt you were?

Page 163

MS. EDWARDS: Objection; leading.

Q. (BY MS. POTTINGER) You can answer.

A. Well, hurt. I didn't think that that could have happen to me, to lose my job.

Q. Okay. Did you -- what about depression? Did you experience any of that?

MS. EDWARDS: Objection; leading.

THE WITNESS: With the help of my kids, no.

Q. (BY MS. POTTINGER) What do you mean? Can you just --

A. They're the ones that keep me going.

Q. Okay. So -- okay. So your kids were helpful?

A. Yes.

Q. Okay. Go back to -- go back to Exhibit No. 12. That's right there.

A. Uh-huh.

Q. And just to clarify, because I want to make sure that I have the correct understanding, this was not given to you until -- on April 30th; is that correct? When the date that you signed it?

A. It was shown to me.

Q. It was shown to you, and then you signed?

A. Yes.

Q. On -- on -- and this was on April 30th; is that correct?

Page 164

A. Yes.

Q. Okay. But not before then?

A. No.

Q. Okay. Was there anything that Trader Joe gave you like this to sign or -- look at number -- Exhibit No. 11. Did they give you anything that you had to put your signature on that -- that would verify that -- that stated that you were acknowledging these -- all these questions and symptoms?

A. No.

Q. Okay. So to your knowledge, the only thing you signed was Exhibit No. 12?

A. Yes.

Q. Okay.

MS. POTTINGER: I have no further questions. I pass the witness.

FURTHER EXAMINATION

BY MS. EDWARDS:

Q. Mr. Ayala, when you're talk -- you said -- you mentioned an employee named Simpson that would be able to --

A. Yes.

Q. -- would be -- tell whether you were asked the questions. Are you talking about Sampson?

A. Yes.

Page 165

Q. Okay. And did he have the same schedule as you?

A. Yes.

Q. Okay.

MS. EDWARDS: I want to mark one more exhibit. 18.

(Exhibit 18 marked.)

Q. (BY MS. EDWARDS) Give you this. And this is a copy of the notes that you brought with you.

MS. EDWARDS: Oops. Sorry.

MS. POTTINGER: I got it.

Q. (BY MS. EDWARDS) Do you see that, sir?

A. Yes.

Q. Is this a copy of the notes that you brought with you that help guide your testimony today?

A. Yes.

Q. And whose handwriting is this?

A. My wife's.

Q. Okay. Did you all talk about kind of what your story was going to be for purposes of this deposition today?

MS. POTTINGER: Objection; form.

THE WITNESS: No.

Q. (BY MS. EDWARDS) Okay. What -- did y'all talk about what to include in this sheet that was the notes

Page 166

you brought with you?

A. No.

Q. She just did this on her own?

A. No.

Q. Okay. Did y'all sit down and go over it together?

A. Yes.

Q. Okay. And why did you think you needed a sheet like this to bring with you?

A. Refresh my mind.

Q. Okay.

MS. EDWARDS: All right. I have nothing further. I pass the witness.

MS. POTTINGER: I have no further questions.

THE VIDEOGRAPHER: All right. It's 3:45. We're off the record.

(Proceedings concluded at 3:45 p.m.)

Page 167

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

JOSE AYALA,                )
                           )
    Plaintiff,             )
                           )      CIVIL ACTION NO.
    vs.                    )        4:21-cv-00408
                           )
TRADER JOE'S COMPANY,      )
                           )
    Defendant.             )

REPORTER'S CERTIFICATION
DEPOSITION OF JOSE AYALA
March 22, 2022

I, Keith McCabe, Certified Shorthand Reporter in and for the State of Texas, hereby certify to the following:

That the witness, JOSE AYALA, was duly sworn by the officer and that the transcript of the oral deposition is a true record of the testimony given by the witness;

I further certify that pursuant to FRCP Rule 30(f)(1) that the signature of the deponent:

____ was requested by the deponent or a party before the completion of the deposition and returned within 30 days from date of receipt of the transcript. If returned, the attached Changes and Signature Page

Page 168

contains any changes and the reasons therefor;

__X__ was not requested by the deponent or a party before the completion of the deposition.

I further certify that I am neither attorney nor counsel for, related to, nor employed by any of the parties to the action in which this testimony was taken.

Further, I am not a relative or employee of any attorney of record in this cause, nor do I have a financial interest in the action.

Subscribed and sworn to on this the 4th day of April, 2022.

Keith McCabe, CSR No. 8873
Expiration Date: 10/31/2022
Lexitas Firm Registration No. 95
13101 Northwest Freeway, Suite 210
Houston, Texas 77040
Phone: 281.469.5580